24000

The STATE, Respondent v. Brian Allen HOFFMAN, Appellant.

(440 S.E. (2d) 869)

Supreme Court

*Chief Atty. Daniel T. Stacey*, of *S.C. Office of Appellate Defense*, of Columbia, *for appellant*.

*T. Travis Medlock, Atty. Gen., Donald J. Zelenka, Chief Deputy Atty. Gen., James G. Bogle, Jr., Asst. Atty Gen.*, Columbia, and *Ralph Wilson, Sol.*, Conway, *for respondent*.

Heard Nov. 1, 1993.

Decided Jan. 24, 1994.

TOAL, Associate Justice:

This case arises from Appellate's conviction for two counts of murder, burglary in the first degree, criminal sexual conduct in the first degree, armed robbery, and grand larceny. We affirm the jury's verdict.

## Facts

Appellant, Brian Hoffman, was tried and convicted for the murder of an elderly couple in Horry County. Sometime in the early morning hours of November 8, 1990, Hoffman was driving from Murrells Inlet to his girlfriend's home in Greenville when the vehicle he borrowed from a friend spun into a ditch. Hoffman determined that he could not extricate the vehicle,

and he approached the home of Mr. and Mrs. Thompkins which was adjacent to the ditch.[1]

Initially Hoffman approached the home but did not enter the residence; instead Hoffman returned to the vehicle and removed a filet knife. After securing the knife, Hoffman returned to the house where he gained entry by breaking the glass out of the back door. Once inside the home, Hoffman encountered Mrs. Thompkins in the living area of the house.

After physically striking Mrs. Thompkins, Hoffman stabbed her three times and then looked through the house for money or valuables. During the stabbing of Mrs. Thompkins, Hoffman heard Mr. Thompkins, who was bedridden, yelling from another room. While searching for the keys to the Thompkins' car, Hoffman found Mr. Thompkins in the bedroom. Mr. Thompkins asked Hoffman to kill him instead of his wife, and Hoffman responded by asking if Mr. Thompkins had any money. Hoffman then went to Mr. Thompkins' bedside where he stabbed Mr. Thompkins. Mr. and Mrs. Thompkins both died as a result of their stab wounds.

After taking the Thompkins' money and car, Hoffman drove to Greenville. Once in Greenville, at the home of his girlfriend's aunt, Hoffman disposed of several papers and a handicap placard registered to the Thompkins. These items were later retrieved from the aunt's trash and turned over to the police.

At 4:10 p.m. on November 8, 1990, Mr. Madert, a contract physical therapist for the Department of Health and Environmental Control, made a house visit to the Thompkins' residence. Becoming suspicious when no one answered the door, Madert walked around the house where he found the broken glass and the door open. Entering the home, Mr. Madert found Mrs. Thompkins lying dead on the floor and her nightgown pulled up to just below her breast line and no underwear. Upon finding Mrs. Thompkins, Madert left the home and called 911.

As the police investigation was beginning in Horry County, Hoffman was picking up his girlfriend and her two children in Greenville. They began the drive back to Horry County stop-

---

[1] At trial, testimony established that Hoffman had been to this particular residence once before when his boss' truck had run out of gas.

ping on several occasions for rest and food, and each time, Hoffman was careful to back the stolen car into parking spaces to obscure the license plate number.

Police officers discovered that the Thompkins' car was missing and issued a bulletin to police officials throughout the state. Meanwhile, Hoffman reentered Horry County where he stopped at a Scotchman store, this time forgetting to back the car into the parking space. A passing officer discovered the car and followed Hoffman after he pulled out of the parking lot. Once Hoffman spotted the police car, he increased his speed until he pulled over and fled into the woods.

Hoffman's girlfriend and her children were taken into custody as the search began for Hoffman. Several days later, Hoffman was apprehended inside an old camping trailer. Once in custody, Hoffman confessed to both killings, breaking into the house, arming himself with a knife, and grand larceny of the vehicle. Hoffman, however, vehemently denied ever having sexual relations with Mrs. Thompkins.

At trial, the State sought the death penalty. The jury found Hoffman guilty of all the crimes charged. As a result of his convictions, Hoffman was sentenced to life on both murder counts, life on the burglary count, thirty years for criminal sexual conduct, twenty-five years for armed robbery, and ten years for grand larceny. All sentences were to be served consecutively, and Hoffman now appeals.

### Issues

On appeal, Hoffman raises the following issues:

1. Whether the trial court erred in denying Hoffman's mistrial motion after the jury foreman sent a note to the judge asking if the jury could ask questions of witnesses to clarify testimony;

2. Whether the trial court erred in admitting evidence that Hoffman had abused his girlfriend on a prior occasion;

3. Whether the trial court erred in refusing to suppress the DNA evidence where the expert's report was provided to defense counsel on the day of the expert's testimony;

4. Whether the trial court's jury instruction on reasonable doubt was violative of Hoffman's due process rights; and

5. Whether the trial court erred in charging that Hoffman's prior crimes could be held against him on the issue of credibility when Hoffman did not testify.

## Law/Analysis

**Mistrial Motion**

Hoffman asserts that the trial court erred in denying his mistrial motion after the jury foreman sent a note to the judge asking if the jury could ask questions of witnesses to clarify testimony. On the fourth day of Hoffman's trial, the jury foreman sent a note to the trial judge asking three questions and making one comment. The handwritten note read:

9-12-91

1) Yesterday the fingerprint expert appeared to me to 1st say that there were prints on the Bronco steering wheel then he said 2 questions later there were no prints. [Do we have] Can this be clarified?

2) If other testimony is not clear or is conflicting do we have a right to clarify and how do we do so?

3) If a juror has a question of a witness that has been called, is there a procedure to ask that question?

4) All Jurors are willing to work Saturday and Sunday if needed.

Thanks

Jim Moore

App. p. 667 [language which was originally crossed out is contained in brackets].

Hoffman argues that this note is clear evidence that the jury began deliberations during the course of the trial. We recently reiterated the rule that a jury should not begin discussing cases or deciding issues until the evidence is introduced, the arguments of counsel are complete, and the applicable law is charged. *Gallman v. State*, 307 S.C.

273, 414 S.E. (2d) 780 (1992); *State v. Pierce*, 289 S.C. 430, 346 S.E. (2d) 707 (1986). Jurors should be instructed not to discuss the case, even with each other, until the case is submitted to them. *Id.; State v. Parker*, 255 S.C. 359, 179 S.E. (2d) 31 (1971).

Both *Gallman* and *Pierce* are distinguishable on their facts. In both cases, the judge condoned premature discussion among the respective jurors. Here, no such judicial encouragement or condonation occurred. The trial judge gave a standard instruction forbidding premature juror discussion *sua sponte*, and after the jury's note, the trial judge gave a curative instruction. Further, the motion for mistrial was not made until much later in the trial.

The trial judge considered the note in its entirety, and in exercising his discretion, found that the note showed that the jury was merely attempting to define their role in the trial process rather than deliberating on the merits. The wording of the note in the record amply supports the judge's findings, especially since any potential harm was cured with the instruction issued by the court.

In light of the judge's curative instruction, we find that the trial court was correct in refusing to grant Hoffman's mistrial motion.

Choking Evidence

Hoffman asserts that the trial court erred in admitting evidence that he had abused his girlfriend on a prior occasion. During the State's case in chief, the State offered the testimony of John Hill. The father of Hoffman's girlfriend, Mr. Hill testified without objection that the weekend prior to the murders he had gone to Horry County to pick up his daughter because Brian Hoffman had gotten drunk, and he had tried to choke her, and he had locked them out of the apartment." ROA p. 190. On re-cross-examination, defense counsel asked, "[t]he weekend before he choked her, were you present? ROA p. 190. Hoffman's own confession referred to a "big fight" with his girlfriend. The initial evidence of choking came into the trial completely without objection.

Hoffman only objected to one question asked of his girlfriend. The solicitor on cross-examination asked the following:

[a]lright, and tell us about his temper during the time

that he would drink alcohol, how he would react to you, and not only to you but to your children?

ROA p. 608. Defense counsel objected, and the trial judge overruled the objection. The girlfriend's response to subsequent questions told of the choking incident and an incident where the child *may* have been abused. The testimony was inferential at best, and defense counsel did not object to either the question or her answer.

The issue which is not properly preserved cannot be raised for the first time on appeal. *State v. Vanderbilt,* 287 S.C. 597, 340 S.E. (2d( 543) (1986). A contemporaneous objection is required to properly preserve an error for appellate review. *State v. Torrence,* 305 S.C 45, 406 S.E. (2d) 315 (1991). Here, the record shows that no such preservation occurred. Defense counsel's lone objection was well after the initial admission of the choking incident.

The defense objection was very broadly made, and not contemporaneous to the answers which Hoffman submits as error. Moreover, in challenging the credibility of the admitted confession, the defense strategy was to impute Hoffman's problems to his alcohol use and his inability to control his alcohol-induced behavior. We decline to find error on the part of the trial judge in admitting this evidence.

Suppression of DNA Evidence

Hoffman next contends that the trial court erred in refusing to suppress DNA evidence where the DNA expert's report was provided to defense counsel on the same day as the DNA expert's testimony. "A trial judge has considerable latitude in ruling on the admissibility of evidence and his rulings will not be disturbed absent a showing of probable prejudice." *State v. Sims,* 304 S.C. 409, 417, 405 S.E. (2d) 377, 382 (1991); *State v. Sosebee,* 284 S.C. 411, 326 S.E. (2d) 654 (1985).

In preparation of the State's case, the State submitted blood samples to the South Carolina Law Enforcement Division for DNA analysis. The samples were submitted several months prior to trial, and it was noted to the defense that the results would take several months. The witness list prepared by the State included the SLED DNA expert as a witness,

and a videotaped deposition taken of another SLED expert referred to the blood samples which were sent to the DNA expert.

On the third day of trial, a copy of the DNA report was provided to defense counsel. The DNA report was dated the day prior and transmitted to the solicitor via FAX. AT 9:00 a.m. the next day, before the DNA expert was to testify, the report was provided to defense counsel who objected that there was insufficient time to prepare for cross-examination. In response to the objection, the trial judge offered to grant a recess to facilitate defense's preparation. Defense counsel declined to accept a recess, moving instead to suppress the evidence. The trial court denied the motion and offered to allow the defense ample opportunity to prepare for cross-examination. The defense again declined.[2]

The record demonstrates that the defense followed an identical strategy in the cross-examination of the DNA expert as was used with the other experts offered by the State. A review of the record shows that the defense had ample notice that a DNA expert was to be called, the the trial court offered sufficient opportunity to prepare for cross-examination, and that the defense declined that opportunity to prepare. Given the nature of the questions asked on cross-examination and defense counsel's failure to ask for anything other than suppression of the evidence, there has been no showing of prejudice to Hoffman.

Reasonable Doubt Charge

Hoffman maintains that the trial court's jury instruction on reasonable doubt is violative of his due process rights.

Hoffman, citing *State v. Manning*, 305 S.C. 413, 409 S.E. (2d) 372 (1991); and *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed. (2d) 339 (1990), argues that the trial court erred by instructing the jury on circumstantial evidence that they "must seek some reasonable explanation thereof other than the guilt of the accused, and if such reasonable explanation can be found, then you cannot convict on such evidence alone." ROA p. 641. Hoffman then complains that the trial

---

[2] The sole basis for the defense objection was lack of preparation to cross-examine. There was no objection citing the need to call its own DNA expert.

judge repeatedly told the jury that a reasonable doubt is one for which you can give a reason. Hoffman asks this Court to read the reasonable doubt charge coupled with the circumstantial evidence charge as a due process violation.

The reasonable doubt charge, when read in its entirety, lacks the offending language present in *Manning* (no reference to "moral or grave certainty" or "real reason"). In *Manning*, we offered a definition which would be acceptable for use by the bench: "[a] reasonable doubt is the kind of doubt that would cause a reasonable person to hesitate to act." *Id.*, 305 S.C. at 417, 409 S.E. (2d) at 375. The present reasonable doubt charge offered similar language:

> so the State must satisfy you, what, beyond a reasonable doubt, a doubt for you, as a conscientious juror, in seeking the truth, will stop and hesitate, and consider the guilt or innocence of a particular person.

ROA p. 636. When the charge is read as a whole, it contains the correct definition and adequately covers the law. *See State v. Rabon*, 275 S.C. 459, 272 S.E. (2d) 634 (1980) (a jury charge which is substantially correct and covers the law does not require reversal). Further, the reasonable doubt charge when read with the circumstantial doubt charge does not place any burden of proof on the defendant. Accordingly, we find that this issue is not meritorious.

Prior Crimes Charge

Hoffman finally argues that the trial court erred in charging that Hoffman's prior crimes could be held against him on the issue of credibility when Hoffman did not testify. As previously noted, the State introduced evidence of a prior choking incident which was not subject to a conviction. The defense similarly offered evidence through an expert witness of Hoffman's previous convictions for two D.U.I. offenses and several disorderly conduct offenses. Hoffman did not testify at trial.

The defense proposed the following charge:

> I charge you that prior criminal acts of this Defendant, brought out by an expert forming his opinion, cannot be used by you against the Defendant.

ROA p. 664. The trial judge stated that he did not charge this defense request because it was covered in the instruction already given to the jury. The defense argued that the standard credibility instruction was incorrect because Hoffman did not take the stand and because the convictions were not for crimes of moral turpitude.

The trial judge charged:

> [a]nd as far as that is concerned, Mr. Foreman, let me further state that any acts, or crimes that might have been alluded to concerning the defendant can only be considered as far as his credibility, not as far as evidence is concerned, as far as the guilt, in any way. But you must decide from the witnesses, and by the exhibits properly introduced, just where the truth lies. And it doesn't matter to you where the truth comes from. It doesn't matter to you whether the truth comes from the witnesses of the State, or the witnesses of the Defendant, or a combination. You aren't interested in where it comes from, you are only interested in the truth.

ROA p. 637. This charge is similar to the requested charge except for the language dealing with credibility. Of further interest, defense counsel began his objection to the charge by noting that the instruction related to the reliability of Hoffman's confession.

When the instruction is read in its entirety, it addresses an issue raised by Hoffman and his defense counsel. The defense strategy was to attack the veracity of Hoffman's earlier confession. To this end, Hoffman offered an expert witness who testified to the effect of alcohol on Hoffman and his general ability to give a credible confession. The confession was damaging evidence which the defense had to overcome, and the prior impact of alcohol was essential to the credibility of the confession.

The question of credibility did not arise from Hoffman's testimony; instead, it arose from Hoffman's confession which was entered into evidence. Credibility was a factor the defense brought before the jury, and the trial judge's instruction addressed the question. Further, the instruction explained to the jury that they could rely solely on the expert's testimony to refute the credibility of the confession. This additional lan-

guage served to Hoffman's benefit, and was essentially what was requested by defense counsel.

Just as with the previous issue, a jury charge which is substantially correct and covers the law does not require reversal. *Rabon, supra.* Therefore, we find that Hoffman's argument is without merit.

Accordingly, for the reasons stated, Hoffman's convictions are AFFIRMED.

CHANDLER, FINNEY and MOORE, JJ., concur.