714 S.E.2d 888

The **STATE,** Respondent,

v.

Brian **GARRIS,** Appellant.

No. 4859.

Court of Appeals of South Carolina.

Submitted May 1, 2011.

Decided Aug. 10, 2011.

Rehearing Denied Sept. 22, 2011.

338

Appellate Defender LaNelle C. DuRant, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia, and Solicitor Ernest A. Finney, III, of Sumter, for Respondent.

SHORT, J.

Brian Garris appeals his convictions of armed robbery, assault and battery with intent to kill (ABWIK), and possession of a firearm during the commission of a violent crime. Garris argues the trial court erred in denying: (1) his motion to dismiss the case or declare a mistrial pursuant to Rule 5, SCRCrimP, or *Brady v. Maryland*[1]; (2) his motion to suppress a gun found in the jail after his arrest on an unrelated charge; (3) his request to call an expert to rebut the State's expert's opinion testimony when the opinion was not contained

---

1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

in the expert's report; and (4) his *Batson v. Kentucky*[2] motion and motion to set aside the jury because the State's peremptory challenges were racially motivated and eliminated all African–American males from the jury. We affirm.[3]

## FACTS

At approximately 10 p.m. on April 15, 2006, Martha Santiago picked up her teenage daughter from a restaurant where her daughter was employed. Immediately after her daughter entered the passenger side of Santiago's van, a man opened Santiago's door, pointed a gun at her, and demanded money. He shot her in the eye when she told him she had no money. Santiago tried to shut the van door, but the man opened the door and shot her in the arm. Santiago's daughter gave the man the forty dollars she had earned from working that evening, and he fled. Santiago was taken to a hospital, and doctors removed a bullet from her arm. Deputy Rick Elms, the lead investigator in the case, took photographs of Santiago's injuries while she was in the hospital. Santiago also provided officers with a description of the assailant for a composite sketch. Approximately one hour after Santiago's shooting, officers spotted Garris and his brother, Quentin Garris, near their residence "about three blocks" from the restaurant.

Almost two weeks later, police arrested Garris on an unrelated offense.[4] Upon his arrival at the jail, officers conducted a pat down search of Garris and placed him in a vacant holding cell. A short time later, a fellow inmate working at the jail found a small caliber revolver while emptying Garris' food tray. The bullet retrieved from Santiago's arm matched the gun found on Garris' food tray. Additionally, an officer obtained samples from Garris' hands at the time of his arrest, and a gunshot residue analysis revealed gunshot residue on both his hands.

---

**2.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**3.** We decide this case without oral argument pursuant to Rule 215, SCACR.

**4.** Garris was arrested for burglary, but was eventually found not guilty of that charge.

A grand jury indicted Garris for armed robbery, ABWIK, and possession of a firearm during the commission of a violent crime. Prior to trial, Garris moved to suppress the gun found at the jail, arguing the jury's knowledge about the unrelated charge would be prejudicial and improperly considered against him. The court denied Garris' motion, finding the probative value of the gun was not substantially outweighed by any prejudicial impact. At trial, when the gun was admitted into evidence, Garris' counsel said: "I object, but go ahead."

During trial, Elms testified he spoke to Santiago's daughter after the incident, and he obtained her statement of the events and a description of the assailant. Because officers saw Garris in the area immediately after the incident, Elms testified he prepared a photographic lineup that included Garris' picture. Santiago's daughter identified Garris in the lineup as a customer she had served in the restaurant that evening. Elms testified that when he showed the same photographic lineup to the daughter nearly a month later, she positively identified Garris as the person who robbed her and shot her mother, but Santiago was never able to identify anyone.

While Elms was on the stand, the State moved to admit the photographs he took of Santiago in the hospital. Garris objected, arguing the photographs were not relevant, and the prejudicial effect outweighed any probative value. The court overruled Garris' objections and admitted the photographs into evidence.

Elms testified on cross-examination about partial handprints that police recovered from Santiago's van. He testified the results showed the prints from the van did not match Garris' prints, and he admitted the evidence had come out for the first time in trial that day. On redirect, when asked if there was "anything you can tell this jury" about the fingerprint analysis, he explained, "I was told the [assailant] never actually touched the van. We just processed the van to be on the safe side, and that's to preserve evidence in case he did touch it as he ran away from the scene." He said the likelihood of finding fingerprints are "slim to none" in these types of cases. However, Elms added the daughter told him at the scene that the assailant touched the van.

In his investigation, Elms also spoke to Garris' friends. Elms testified that Andrew McBride and Freddie White told him Garris had a small handgun the evening before the robbery. White also testified he saw Garris with a gun the night of the incident. White told Elms he saw Garris around 10:30 or 11:00 p.m. the night of the incident, and Garris was out of breath and sounded like he had been running. Additionally, White told Elms that Garris had two twenty-dollar bills in his possession the day after the incident.

At the conclusion of the State's case, Garris made a motion to dismiss the case or declare a mistrial pursuant to Rule 5, SCRCrimP, and *Brady v. Maryland*[5], arguing evidence was presented at trial that was not presented in discovery, and he was not aware of the evidence until "in the midst of the court proceeding." Specifically, Garris argued the State did not provide him with the photographs Elms took of Santiago in the hospital, inform him Santiago was shown a photographic lineup that contained Garris' picture, or give him the fingerprint analysis results of the prints from Santiago's van. Garris also renewed his motion for a mistrial at the close of his case, which the court denied.

The jury found Garris guilty as charged, and the court sentenced Garris to consecutive terms of twenty years' imprisonment for armed robbery and ABWIK, and five years' concurrent imprisonment for possession of a firearm during the commission of a violent crime. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only and is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). Thus, on review, the appellate court is limited to determining whether the trial judge abused his discretion. *Id.* An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. *State v. Garrett*, 350 S.C. 613, 619, 567 S.E.2d 523, 526 (Ct.App.2002).

---

5. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## LAW/ANALYSIS

### I. Motion to Dismiss or Declare a Mistrial

Garris argues the trial court erred in denying his motion to dismiss the case or declare a mistrial pursuant to Rule 5, SCRCrimP, or *Brady v. Maryland*[6] because the State did not provide him with the results of the fingerprint analysis, photos of Santiago's injuries, or the photographic lineup shown to Santiago. We disagree.

The decision to grant or deny a mistrial is within the sound discretion of the trial court. *State v. White*, 371 S.C. 439, 443, 639 S.E.2d 160, 162 (Ct.App.2006). The trial court should only grant a mistrial in cases of manifest necessity and with the greatest caution. *Id.* at 444, 639 S.E.2d at 162. It is within the trial court's discretion, however, to determine whether such necessity exists under all the circumstances of each case. *Id.* The trial court should first exhaust other methods to cure possible prejudice before declaring a mistrial. *Id.* The defendant must show error and resulting prejudice to receive a mistrial. *State v. Council*, 335 S.C. 1, 13, 515 S.E.2d 508, 514 (1999).

On appeal, this court will not overturn the court's decision absent an abuse of discretion that amounts to an error of law. *White*, 371 S.C. at 443, 639 S.E.2d at 162. South Carolina courts favor the trial court's exercise of wide discretion in determining the merits of such a motion in each individual case. *Id.* at 443–44, 639 S.E.2d at 162. Thus, this court will intervene and grant a new trial only in cases when an abuse of discretion results in prejudice to the defendant. *Id.* "The granting of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way." *State v. Kelsey*, 331 S.C. 50, 70, 502 S.E.2d 63, 73 (1998).

At trial, Garris made a motion to dismiss the case or declare a mistrial based on a violation of Rule 5, SCRCrimP, or *Brady v. Maryland*[7] regarding the fingerprint analysis because he

---

6. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. Rule 5 provides that upon request by a defendant, the prosecution must permit the defendant to inspect and copy any books, papers,

was not aware of the analysis or the results until he questioned Elms during cross-examination. Garris also asserted the State had not given him the pictures of Santiago's injuries or a copy of the photographic lineup, and he was not even informed Santiago had been shown a photographic lineup until the day of trial.[8] Garris asserted his first attorney, who was a public defender, made a Rule 5/*Brady* motion, and the fact that he subsequently hired private counsel did not negate the motion. The solicitor responded that she gave Garris' new counsel everything that she had given to his first attorney, but she conceded Garris did not receive a copy of the pictures of Santiago's injuries. At that time, the court held Garris' motion for mistrial in abeyance, and when Garris renewed the motion at the close of his case, the court denied his motion.

Garris now argues he was prejudiced by the fact that he did not know prior to trial that the prints on Santiago's van did not match his prints because had he known, he could have developed questions for cross-examination or hired his own expert to develop the issue. Garris also argues that had he known about the photographic line-up that was shown to Santiago, he could have used it in his pretrial hearing when he made a motion to exclude Santiago's daughter's photographic

---

documents, photographs, tangible objects, results or reports of physical or mental examinations, or scientific tests or experiments, or copies or portions thereof, that are within the possession, custody, or control of the prosecution, or the existence of which is known, or by the exercise of due diligence may become known to the prosecution, and that are material to the preparation of defendant's defense or are intended for use by the prosecution as evidence in chief at the trial. Rule 5(a)(1)(C)–(D), SCRCrimP. The *Brady* court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194.

8. Garris objected to the introduction of the photos of Santiago's injuries when the State sought to introduce them into evidence; however, he only objected to them on the ground of relevance. The court said: "Do you have an objection to [the] photos?" Garris' counsel responded: "Yes, sir. In the course of the—I don't have both pictures in my discovery package. But my objection would be relevance. My argument is prejudicial and a prejudicial [e]ffect far [outweighs] the probative value." The court then overruled Garris' objection, finding the prejudicial impact did not substantially outweigh the probative value.

line-up identification of Garris.[9]

We find the omission of Santiago's photos was not material because nothing indicates Garris was unaware of the extent of Santiago's injuries. Additionally, Garris' objection to the photos at trial was based on relevance and prejudicial impact.[10] Thus, although Garris objected to the introduction of the photos, he did not specifically object on the ground that he had not previously received a copy of the photos. As a result, we find this issue is not preserved for our review. *See Staubes v. City of Folly Beach,* 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review.").

Garris also asserts he was unaware until the day of trial of the fingerprint analysis or the results finding the prints did not match his prints. Elms testified officers processed Santiago's van for prints as part of their normal procedure to preserve evidence and found partial handprints on the van. Elms said the prints taken from the van had been in the case file since the day of the incident. The prints were then tested and compared to Garris' prints, and they did not match. Elms did not think the prints were left by the assailant.

Garris argues on appeal that had he known the prints found on the van did not match his prints, he could have "hired an investigator to possibly learn who the fingerprints belong to which could have raised the potential of identifying someone else as the assailant at least to the point of creating a reasonable doubt for the jurors." However, Garris did not object to Elms' testimony on the ground that he had not previously been given the fingerprint evidence until after the State rested its case. Therefore, we find this issue is not preserved for our review. *See State v. Hoffman,* 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994) ("A contemporaneous objection is required to properly preserve an error for appellate review."); *State v. Burton,* 326 S.C. 605, 609, 486 S.E.2d 762, 764

9. During the hearing, the court admitted the photographic line-up.

10. Garris does not raise this issue on appeal.

(Ct.App.1997) ("Failure to object when the evidence is offered constitutes a waiver of the right to object.").

Additionally, Garris asserts on appeal that he did not receive a copy of the photographic lineup shown to Santiago, and if he had known about the lineup, he could have used the information in his pretrial motion to exclude the lineup that was shown to Santiago's daughter. However, Garris did not make a contemporaneous objection to Elms' testimony about the lineup that was shown to Santiago. Garris did not make his objection to the testimony on the ground that he had not previously been given the lineup evidence until after the State rested its case; thus, we find this issue also is not preserved for our review. *See Hoffman*, 312 S.C. at 393, 440 S.E.2d at 873 ("A contemporaneous objection is required to properly preserve an error for appellate review."); *Burton*, 326 S.C. at 609, 486 S.E.2d at 764 ("Failure to object when the evidence is offered constitutes a waiver of the right to object.").

## II. Motion to Suppress Gun

Garris argues the trial court erred in denying his motion to suppress the gun found in Garris' jail cell after his arrest on an unrelated charge. We disagree.

Garris made a pretrial motion to suppress a gun found at the jail while he was incarcerated on an unrelated burglary charge. He argued it was more prejudicial than probative because he was ultimately found not guilty of the unrelated charge, and it might prejudice the jury. The trial court found the probative value of the gun substantially outweighed the prejudicial impact. Before admitting the testimony regarding the seizure of the gun, the court gave the jury a limiting charge that Garris had been in jail for dismissed charges, and they were not to consider that against Garris. Garris objected when the gun was admitted into evidence, but he did not object to the court's limiting instruction. On appeal, Garris argues he was prejudiced by the admission of the gun because the jury knew he was arrested for a different charge and there was a reasonable probability the jury would believe he had a propensity to commit crimes.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. All relevant evidence is admissible. Rule 402, SCRE. However, even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. The admission of evidence is left to the sound discretion of the trial court, whose decision will not be reversed on appeal absent an abuse of discretion. *State v. Howard*, 384 S.C. 212, 220, 682 S.E.2d 42, 47 (Ct.App.2009). To warrant reversal based on the admission of evidence, the complaining party must prove both the error of the ruling and the resulting prejudice. *Id.* at 221, 682 S.E.2d at 47. "[E]vidence which is 'logically relevant to establish a material element of the offense charged is not to be excluded merely because it incidentally reveals the accused's guilt of another crime.'" *State v. Wiles*, 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009) (quoting *State v. Green*, 261 S.C. 366, 371, 200 S.E.2d 74, 77 (1973)).

At the time of his arrest for the unrelated burglary, officers obtained samples from Garris' hands, and a gunshot residue analysis later revealed gunshot residue on both hands. Elms testified he received the bullet that doctors removed from Santiago's arm and took it to the South Carolina Law Enforcement Division (SLED) for comparison to the gun found on Garris' food tray at the jail while he was incarcerated for the burglary charge.[11] SLED determined the gun found at the jail fired the bullet that doctors removed from Santiago's arm. Additionally, Elms spoke to Garris' friend who told him that Garris had a small handgun the evening before the robbery.

---

11. When Garris was arrested for the unrelated burglary, he was taken to the jail. Upon his arrival at the jail, officers conducted a pat down search of him. Garris then requested to use a bathroom, and officers allowed him to use the bathroom in a vacant holding cell. The cell's bathroom had a door that Garris closed, and he was alone in the room. After Garris finished using the bathroom, his clothes were taken from him, and he was placed back in the same unoccupied holding cell. A short time later, a fellow inmate found a gun while emptying Garris' food tray. An officer at the jail removed the gun from the trash, placed it in an evidence bag, and gave it to the director of the jail. The director then turned the gun over to the sheriff's office.

Thus, the gun found at the jail linked Garris to the charges in this case and was logically relevant to the case. *See State v. Stokes*, 381 S.C. 390, 405, 673 S.E.2d 434, 441 (2009) (finding a gun from a subsequent shooting was logically related to the instant case when the forensic evidence positively showed the same gun was used in a prior break-in because a bullet found in the bedroom where the victim was shot also matched the gun, and this connection was highly probative on the issue of the identity of at least one of the intruders because the victims in the instant case were unable to identify their attackers). Moreover, the court gave the jury a limiting charge. Therefore, we find the trial court did not err in denying Garris' motion to suppress the gun.

### III. Expert Testimony

 Garris argues the trial court erred in denying his request to call an expert to rebut the reply testimony given by the State's expert about what type of gun the residue came from because his opinion was not contained in his report.[12] We disagree.

 "[O]rdinarily, the admission of reply testimony is within the sound discretion of the trial court." *State v. Farrow*, 332 S.C. 190, 194, 504 S.E.2d 131, 133 (Ct.App.1998). Reply testimony should be limited to rebuttal of matters raised in defense; however, the improper admission of reply testimony will only result in reversal if the admission of such testimony is found to be prejudicial. *Id.*

Garris took the stand and testified he did not have or handle a gun the day he was arrested. He did testify that he fired a rifle the day before. In response, at the close of Garris' case, the State called in reply John Roberts, a SLED agent who

---

12. The State argues this issue is not preserved for appeal because no proffer was made by Garris. Generally, when testimony is excluded, "a proffer of testimony is required to preserve the issue of whether testimony was properly excluded by the trial judge, and an appellate court will not consider error alleged in the exclusion of testimony unless the record on appeal shows fairly what the excluded testimony would have been." *State v. Santiago*, 370 S.C. 153, 163, 634 S.E.2d 23, 29 (Ct.App.2006). In this case, however, Garris did not have an expert to proffer, and he was unable to explain what his expert witness' testimony might have been because he did not have one at the time. Therefore, we address the merits of this issue.

performed a gun residue analysis on samples taken from Garris' hands.

In proffered testimony, Roberts testified he found gun residue on the front and back of both of Garris' hands. As a result, he proceeded with the second level of testing, which required a microscope. At the second level, he found residue on Garris' right palm, but the left palm was inconclusive. Therefore, Roberts concluded either Garris had fired a weapon in the six hours before the test, or he had been near the weapon when it was fired. The court asked Roberts if he had an opinion as to whether the weapon that was fired was a pistol or a rifle. Roberts stated that in his opinion, not with any reasonable degree of certainty, it was a pistol. Garris objected to Roberts' opinion because it was not in Roberts' report, and Garris had just learned about it during Roberts' testimony. Therefore, Garris asserted Roberts' opinion was prejudicial and not relevant. However, the court allowed Roberts' testimony to be presented to the jury to rebut Garris' testimony that he did not own a pistol or fire one.

During Roberts' testimony before the jury, the State asked him if he had an opinion as to whether Garris shot a pistol or a rifle. In response, Roberts stated he could form an opinion based on the amount of residue found, and in this case, his opinion was it most likely was a pistol. Garris objected, and the court overruled his objection. At the close of the reply testimony, Garris asked for an opportunity to rebut Roberts' opinion by calling his own expert. The court denied his request.

On appeal, Garris argues the court prevented him from presenting a complete defense by not allowing him to call his own expert to rebut Roberts' testimony. He asserts he was prejudiced by the inability to call his own expert because Roberts' opinion was not in his report.

The State put Roberts on the stand in reply to rebut Garris' testimony that he did not own a pistol and had not shot one the day of the incident. Thus, Roberts' testimony was properly limited to a reply to Garris' testimony, and Garris cannot claim he did not have an adequate opportunity to contest the evidence. *See Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 438, 319 S.E.2d 695, 700 (1984) (holding

the limited nature of the rebuttal evidence did not substantiate appellant's claim that it was without an adequate opportunity to contest such evidence because the issues addressed in rebuttal were the identical issues identified and pursued by appellant's own witness). Additionally, Garris was able to cross-examine Roberts about his opinion.

Therefore, we find Garris has failed to demonstrate how he was prejudiced by not being permitted to call his own expert to rebut Roberts' testimony, and the trial court did not err in denying Garris' request to call an expert to rebut the State's expert's testimony.

### IV. Jury Strike

Garris argues the trial court erred in denying his *Batson v. Kentucky*[13] motion and refusing to set aside the jury because the State's peremptory challenges were racially motivated and eliminated all African–American males from the jury. We disagree.

In *Batson*, the Supreme Court of the United States held that the Equal Protection Clause forbids a prosecutor from challenging "potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially [sic] to consider the State's case against a black defendant." *Id.* at 89, 106 S.Ct. 1712; *see State v. Evins*, 373 S.C. 404, 415, 645 S.E.2d 904, 909 (2007) ("The Equal Protection Clause of the Fourteenth Amendment to the Constitution prohibits the striking of a venire person on the basis of race or gender."). However, a solicitor can strike a potential juror based on his or her demeanor and disposition. *State v. Wilder*, 306 S.C. 535, 538, 413 S.E.2d 323, 325 (1991).

In *Evins*, our supreme court explained the proper procedure for a *Batson* hearing:

After a party objects to a jury strike, the proponent of the strike must offer a facially race-neutral explanation. Once the proponent states a reason that is race-neutral, the burden is on the party challenging the strike to show the explanation is mere pretext, either by showing similarly situated members of another race were seated on the jury or that the reason given for the strike is so fundamentally

---

**13.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

implausible as to constitute mere pretext despite a lack of disparate treatment.

373 S.C. at 415, 645 S.E.2d at 909. "The burden of persuading the court that a *Batson* violation has occurred remains at all times on the opponent of the strike." *Id.* The trial court's findings regarding purposeful discrimination are given great deference and will not be set aside by this court unless clearly erroneous. *Id.* at 416, 645 S.E.2d at 909–10. "It is within the discretion of the trial judge to determine purposeful discrimination based on the 'totality of relevant facts,' including the credibility of the solicitor." *Wilder*, 306 S.C. at 538, 413 S.E.2d at 325. A defendant has no right to trial by a particular jury, and the right to serve on a jury and not be discriminated against because of race or gender belongs to the potential juror, not a litigant. *Evins*, 373 S.C. at 416, 645 S.E.2d at 910.

■ During jury selection, the State exercised four peremptory strikes against four African–Americans—two males and two females. Immediately after jury selection, Garris made a motion to set aside the jury based on a *Batson* violation. On appeal, Garris argues two of the State's peremptory challenges were racially motivated, and the court erred in refusing to set aside the jury. Garris alleges the State's reasons for striking jurors number 116 and 50, both African–American males, were pretextual.

The State explained it struck juror number 116 because the juror said he could not read or write well and sometimes he had trouble understanding things. The solicitor found the juror's comment troubling "because this is a very complex case with lots of witnesses and it's—it really will be like putting a puzzle together. He's got to figure out that this person testified to this because down the line it relates to this. And I just think it would be too complex for him." Garris argued the State's reason was pretextual; however, he agreed with the trial court that no other jurors were similarly situated.

The State explained it struck juror number 50 because he was close in age to Garris and was from Manning; therefore, the solicitor assumed that the juror and Garris went to school together. Garris argued this reason was also pretextual because "just because he's young, lives here in Manning doesn't

necessarily mean he knows Mr. Garris," "doesn't mean he has some connection or affiliation with Mr. Garris," and "he didn't say he knew Mr. Garris ... when the question was posed to the jury panel." Garris also pointed out that the State did not strike a white male who was also close in age to Garris. The State responded that juror lived in Turbeville.

The court stated the strike of juror number 50 gave him pause, but that he was required to look at the totality of the circumstances and the burden was on Garris to prove the strike was used in a racially-biased manner. The court then denied Garris' motion and seated the jury as selected. The State's reasons for striking jurors do not have to be reasonably specific or legitimate. *State v. Easler*, 322 S.C. 333, 350, 471 S.E.2d 745, 755 (Ct.App.1996). The reason need only be race neutral. *Id.* We do not find the court's rulings regarding purposeful discrimination were clearly erroneous based on the totality of relevant facts. Accordingly, we find the trial court properly determined the solicitor's stated reasons for striking the jurors were race-neutral, and Garris' *Batson* motion was properly denied.

## CONCLUSION

Accordingly, Garris' convictions of armed robbery, ABWIK, and possession of a firearm during the commission of a violent crime are

**AFFIRMED.**

KONDUROS and GEATHERS, JJ., concur.