KONDUROS, J.:
**99 In this criminal case, Robert Jared Prather appeals his convictions of murder and armed robbery, arguing (1) the State's expert witness's testimony was not proper rebuttal testimony, not scientifically valid, and invaded the province of the jury; (2) the expert's testimony was not properly produced during discovery; (3) the State "sandbagged" the defense with the expert's rebuttal testimony; (4) Prather's codefendant's statement was inadmissible hearsay and violated Prather's Confrontation Clause rights; (5) the trial court erred in denying Prather's motion for a directed verdict; (6) the State's actions in pursuing factually inconsistent theories in Prather's and his codefendant's cases denied Prather's right to due process; (7) the trial court denied Prather due process because it did not allow him to introduce a statement made by an unavailable witness; and (8) the trial court violated Prather's Fourth Amendment rights because it did not suppress evidence produced as the result of a fatally defective warrant. We reverse and remand.
FACTS
A grand jury indicted Prather for the murder of Gerald Stewart (Victim), armed robbery, and first-degree burglary.[1] Prather was originally tried in October of 2009, but that trial resulted in a hung jury. At the second trial, Officer Ronald Suber testified he went to the hospital on April 22, 2005 in response to a sexual abuse claim involving a male victim. Officer Suber indicated Prather told him that he, Phillips, and Victim were drinking at Victim's residence and Phillips passed out on the couch. Officer Suber explained Prather stated he left the residence and when he returned, Victim answered the door completely nude. According to Officer Suber, Prather claimed Victim asked him if he knew Phillips "likes to have his dick sucked." Officer Suber said Prather explained he pushed his way past Victim and found Phillips in a bedroom "wearing nothing but his boxer shorts and asleep on the bed." Officer Suber testified Prather said, "I beat the shit out of [Victim] and those were devastating blows." Officer Wayne Kleckley **100 testified Prather also told him "he beat up" Victim. Officer Suber transported Prather to the police station for "investigative purposes" after he learned Victim was dead.
Donna Sharpe, a nurse, testified Phillips told her all he remembered was waking up in his boxers. Sharpe stated Prather admitted he beat Victim and he was "probably still laying there." Sharpe explained Prather asked her if he could wash his hands because he hated getting blood on them and he laughed. Sharpe testified Prather asked, "I'll probably go to jail for this, won't I?" Sharpe asked if he meant for beating Victim, and Prather replied "yes, I beat him. But he's alive though, maybe barely though."
Officer Brandon Field testified he was dispatched to check on Victim at his residence at approximately 5:30 a.m. on April 22, 2005. Officer Field explained he found Victim dead "underneath a blanket, kind of on [his] knees, knelt down, like face-down on the couch." Virginia Youmans, a medical technician, testified Victim had "what appeared to be markings or carvings more or less on the small of *421 [his] back or the lower back area where you[r] pants and shirt would meet." Youmans stated the word carved was "rapist." Officer Al Stuckey stated he discovered an adult sex toy, a dildo, underneath Victim's armpit at the crime scene.
Dr. Janice Ross, a pathologist, testified Victim suffered bruising around his eye, scalp, and lips; a fractured nose and ribs; scratch marks on his thigh and buttocks; and a burn mark on his finger, which was likely from a cigarette. She stated Victim's blood test revealed 0.279 percent alcohol and Valium in his system. Dr. Ross believed Victim's death was caused by an irregular heartbeat, due to the stress of a beating and his enlarged heart. She opined a healthier person could have survived the beating. Dr. Ross explained she could not rule out suffocation as a contributing cause because of the position of Victim's body.
Ronald Rabon testified he was Victim's roommate. He had moved in approximately a week before the incident after having met Victim in an alcohol rehabilitation facility. Rabon testified he had only recently discovered Victim was a homosexual, and he planned to move out. He stated he returned from work the day of the incident and Prather and Phillips **101 were drinking with Victim at his residence. Rabon was in and out of his room throughout the evening, also drinking, and he testified he saw Phillips hit Victim twice and bust Victim's lip. Victim fell onto a chair, and Prather and Rabon told Phillips to stop. Rabon testified he, Prather, and Phillips left the residence to buy cocaine. Rabon explained that after they returned, Prather left again. Rabon claimed he went to his bedroom and when he emerged he observed Phillips and Victim in activity of a "sexual nature." He later observed Phillips and Victim on Victim's bed. Rabon later heard Prather yelling for Phillips. Rabon testified he went to sleep and woke up "with about four cops standing over me."[2]
Prather took the stand in his defense. He testified he and Phillips had spent the afternoon at Victim's house drinking and hanging out. Prather indicated that at one point, Victim and Phillips got into a fight outside the residence. Prather stated the fight broke up, but when they came back inside Phillips hit Victim twice again until Rabon and Prather told him to stop. The parties were in and out throughout the afternoon and evening replenishing alcohol and cigarettes. Finally, Prather claimed he left Victim's residence to buy cocaine. When he returned, Victim "came out [of] the bedroom completely naked with an erection" and told him Phillips "liked his dick sucked." Prather stated he wanted to take Phillips home but Victim told him "you're not going any fucking where." Prather testified he hit Victim three times because Victim grabbed his arm and he wanted to get away. Prather stated he "jumped up and went to the bedroom door" and found Phillips "in his bed in his boxers." Prather claimed "there was a dildo on the bed by [Phillips]'s feet." Prather testified he and Phillips went to the living room and Phillips "was screaming and upset and kicking" Victim. Prather claimed that as they were leaving, Phillips went back inside to get his shoes and Prather waited in his vehicle for about ten minutes. Prather testified Victim was still alive when he left. Prather explained he and Phillips eventually went to the hospital, where Prather told hospital staff Victim had raped Phillips.
**102 On cross-examination, Prather denied telling Officer Suber he "beat the shit out of [Victim] and those were devastating blows." Prather claimed he hit Victim only three times as necessary to defend himself against a larger man. Prather stated he was not responsible for "leaving [Victim] in this condition," including beating him on the sofa, carving rapist on his back, or covering him with a blanket.
After the defense rested, out of the presence of the jury, the State informed the trial court it intended to call Paul LaRosa, an expert on crime scene analysis, as a reply witness "to explain the crime scene." Prather argued the reply testimony was not an "appropriate response to the testimony given by the defendant." The State asserted it was appropriate rebuttal testimony because Prather claimed "he left the house and that *422 anything done after he left was done by Mr. Phillips."
LaRosa testified he worked at South Carolina Law Enforcement Division (SLED) as a special agent for eighteen years and worked in the crime scene unit for six years. LaRosa stated he was "currently assigned to the behavioral science unit as a criminal profiler" and his duties included reconstructing crime scenes to determine the natural flow of the crime. LaRosa testified he "trained under [a] court qualified crime scene analyst" and "went through intensive training with our Department of Mental Health." LaRosa stated he completed his crime scene analysis training in a two-month long program with the Federal Bureau of Investigation. LaRosa explained he previously testified as an expert in crime scene reconstruction and assessment but this was "the first time as a crime scene analyst through the behavioral science program."
LaRosa stated he never physically examined the crime scene but rather reviewed photographs and a video of the crime scene along with reports regarding how police found Victim's body and Victim's autopsy report. LaRosa indicated he went over this case with two other crime scene analysts at SLED and they agreed with his analysis. LaRosa testified that the carving in Victim's backside and placement of the dildo, coupled with the opposing behavior of covering Victim, led him to believe there were "two specific personalities [and therefore] two offenders within that crime scene." LaRosa admitted he had not made criminal profiles for Prather, **103 Phillips, or Victim because he "couldn't get a complete victimology, I couldn't look at their past histories, their psychological files or any of that." On cross-examination, LaRosa testified he also reviewed the transcript from Prather's first trial and "some of" Phillips's statements but claimed he did not use the statements in his analysis. LaRosa indicated the information provided to him by the prosecution was sufficient for him to determine "how many offenders were in the scene." LaRosa admitted he had "not looked at any mental health history from Mr. Prather, Mr. Phillips[,] or [Victim]."
Prather argued LaRosa's testimony was not proper reply testimony, it did "not possess enough scientific validity," and LaRosa was not "qualified as an expert in this area and never has been accepted as one." The trial court found the testimony appropriate on rebuttal based on Prather's claims as to what had occurred the night of the crime. The court explained under State v. White ,[3] an expert witness can meet the qualification threshold and it is "up to the jury to believe ... an expert witness." The court found LaRosa "sufficiently convinced the court that he qualifies as an expert in the field of crime scene analysis with regard to ... crime scene assessment, behavioral analysis." The court also found the testimony was "sufficiently relevant, probative, and reliable." The court cautioned the State "no identification can be made as to who did what and no suggestion can be made to the jury as to their conclusion as to who did what." Prather objected to the court's ruling, arguing LaRosa's testimony would invade the province of the jury.
In the presence of the jury, LaRosa explained an offender uses "staging" to alter "the crime scene from what truly happened. It is to get law enforcement ... on a different idea." He testified the carving of the word rapist on Victim's backside did not impact the actual murder and was a "superficial wound." LaRosa explained, "It's the offender's way of saying, hey, look at this guy. Not only is he a bad guy, he's **104 bad enough that somebody's carving rapist in his back." He testified, "Whether ... that is what they believe or not, I can't say, but they want to project that to the first responders that this guy's a rapist." LaRosa stated the placement of the dildo was "another example of evidence that is not necessary to commit the crime." He continued "not only is this offender, *423 the personality wanting to carve rapist into this individual[']s back, he finds that one item for shock value to show what type of rapist he is and ... places it gently underneath his arm pit." Additionally, LaRosa testified, "This is a classic case of undoing, which is covering up the victim with a blanket and pillow. It is symbolically erasing what has occurred in the scene." LaRosa stated the theories of staging and undoing "are in absolute conflicts with each other." He concluded there were "[t]wo distinct offenders who [in] the heat of the moment one of them decides to carve the word rapist and place an adult sex toy, a dildo next to him, and the other one taking blankets and wanting to erase, to just undo what has just occurred." He also stated, "I can't tell which offender, if both of them were not participating in the crime itself, of the physical assault, but there were two offenders that have different personalities, different behaviors at the end while the victim is dying."
The jury found Prather guilty of murder and robbery. The trial court sentenced Prather to ten years' imprisonment for robbery and thirty years' imprisonment for murder, to run concurrently. Prather filed a motion for a new trial, arguing the trial court erred by allowing LaRosa's reply testimony and qualifying him as an expert in "crime scene analysis." The trial court denied Prather's motion. This appeal followed.
LAW/ANALYSIS
I. Rebuttal Testimony
Prather argues the trial court erred in permitting LaRosa's testimony on reply. We agree.
The admission of reply testimony is within the sound discretion of the trial court. State v. Todd , 290 S.C. 212, 214, 349 S.E.2d 339, 340 (1986). "Reply testimony should be limited to rebuttal of matters raised by the defense, rather than to complete the plaintiff's case-in-chief." State v. Huckabee , 388 S.C. 232, 242, 694 S.E.2d 781, 786 (Ct. App. 2010). Testimony **105 that is "arguably contradictory and in reply to" that offered by the defense is admissible. Todd , 290 S.C. at 214, 349 S.E.2d at 340. However, reply testimony should be limited to that which refutes or rebuts testimony presented by the defendant. See State v. Durden , 264 S.C. 86, 90, 212 S.E.2d 587, 589 (1975) (finding reply testimony proper noting "[t]he reply testimony did not go beyond a refutation of that which the [defendant]'s witness had asserted"); State v. Garris , 394 S.C. 336, 351, 714 S.E.2d 888, 896 (Ct. App. 2011) (affirming admissibility of reply testimony that rebutted the defendant's claim he did not own a pistol or fire one on the day in question); Palmetto All., Inc. v. S.C. Pub. Serv. Comm'n , 282 S.C. 430, 438, 319 S.E.2d 695, 700 (1984) (finding admission of rebuttal testimony appropriate when "[t]he Commission properly limited the rebuttal evidence strictly to a reply to [the appellant]'s evidence, and the Commission's Order demonstrates clearly that [the respondents'] rebuttal evidence was related only to the specific issues raised by [the appellant's witness]").
In Durden , in which the defendant was convicted of killing his wife's ex-husband, the wife "testified that she had on occasions called the police to their home because of rowdy conduct of the [victim] on her premises." 264 S.C. at 90, 212 S.E.2d at 589. In reply, the State called a police officer who denied this testimony and testified the police had not received any calls about the victim. Id. Our supreme court found the officer's "reply testimony was made necessary by the evidence which the [defendant] had submitted. The reply testimony did not go beyond a refutation of that which the [defendant]'s witness had asserted." Id. The court reasoned it could "hardly be argued that the [defendant]'s counsel was taken by surprise." Id. Accordingly, the court found "no error." Id. at 90, 212 S.E.2d at 590.
In Garris , the defendant argued "the trial court erred in denying his request to call an expert to rebut the reply testimony given by the State's expert." 394 S.C. at 350, 714 S.E.2d at 896. Our court explained the defendant "took the stand and testified he did not have or handle a gun the day he was arrested [but] fired a rifle the day before." Id. In response, the State called "a SLED agent who performed a gun residue analysis on samples taken from [the defendant's] hands." Id. at 350-51, 714 S.E.2d at 896. In proffered *424 testimony, **106 the agent opined the defendant had fired a pistol; the defendant objected because this information was not in the agent's report and the defendant had just learned about it during the proffered testimony. Id. at 351, 714 S.E.2d at 896. However, the trial court allowed the "testimony to be presented to the jury to rebut [the defendant's claim] he did not own a pistol or fire one." Id. Our court found the agent's "testimony was properly limited to a reply to" the defendant's testimony because the State put the agent on the stand to rebut the defendant's "testimony that he did not own a pistol and had not shot one the day of the incident." Id.
Furthermore, in State v. McDowell , the defendant was convicted of murdering his sixteen-year-old son by shooting him in the head, and the defendant told the police his "third shot was fired after [the victim] had fallen to the floor." 272 S.C. 203, 205, 249 S.E.2d 916, 917 (1978) (per curiam). "At trial, however, [the defendant] testified the third shot was fired in rapid succession to the second shot while [the victim] was standing." Id. The defendant argued the trial court "erred by permitting the examining pathologist to testify for the State on reply that the victim's head was resting against a hard, flat object at the time the third shot was fired." Id. at 206, 249 S.E.2d at 917. The basis for the defendant's argument was his "contention that this testimony should have been introduced during the State's case[-]in[-]chief and was improper reply testimony." Id. Our supreme court found the testimony "was in reply to the [defendant]'s testimony that the third shot was fired while the victim was still standing," and was unnecessary "until the [defendant] testified in direct opposition to his earlier statements." Id. at 206-07, 249 S.E.2d at 917.
Unlike the previous cases, LaRosa's testimony was not proper reply testimony because the rebuttal should have been limited to refuting Prather's testimony, rather than to complete the State's case-in-chief. Prather claimed he waited in his vehicle for about ten minutes after Phillips went back inside Victim's residence. He denied carving rapist in Victim's back and covering Victim with a blanket, and he claimed he merely saw "a dildo on the bed by [Phillips]'s feet." In reply, LaRosa opined there were "two distinct offenders" in this crime scene because there were "two specific personalities." LaRosa testified in detail about staging and undoing, why someone would carve rapist in a victim's back, and about the level of anger **107 associated with superficial cutting. LaRosa opined the offenders used the dildo "for shock value to show what type of rapist [Victim] is" and the blanket to "symbolically eras[e]" what had occurred at the scene.
Prather did not testify to the number of perpetrators or to anyone's motives for carving rapist, for the placement of the dildo, or for covering Victim with a blanket at the scene.[4] He did not testify to any of the conduct surrounding these events.
He did not testify they happened in a specific manner or for a specific reason but simply denied doing them or being present when they occurred. Such broad expert testimony on reply "explain[ing] the crime scene" could not reasonably be anticipated by Prather. See McGaha v. Mosley , 283 S.C. 268, 277, 322 S.E.2d 461, 466 (Ct. App. 1984) ("Since reply testimony is limited to issues raised by the defense, the element of surprise is eliminated when reply is properly restricted."); Durden , 264 S.C. at 90, 212 S.E.2d at 589 (finding "reply testimony did not go beyond a refutation of that which the appellant's witness had asserted[,]" and therefore it could "hardly be argued that the appellant's counsel was taken by surprise").
*425 Accordingly, we conclude the trial court abused its discretion in allowing LaRosa's testimony on reply as it was not limited to refuting or rebutting specific testimony from Prather, but was general testimony as to the circumstances of the crime.
II. Harmless Error
The State contends the admission of LaRosa's reply testimony was harmless beyond a reasonable doubt because **108 Prather admitted he assaulted Victim, and LaRosa's testimony did not identify Prather as the second perpetrator. We disagree.
"Whether an error is harmless depends on the circumstances of the particular case." State v. Mitchell , 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial.' " Id. (quoting State v. Key , 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971) ). "[O]ur jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict." State v. Tapp , 398 S.C. 376, 389-90, 728 S.E.2d 468, 475 (2012).
In this case, the jury was presented with testimony regarding prior statements by Prather to police and the emergency room nurse that he had beat up Victim and had struck him with "devastating blows" and had "beat the shit" out of Victim. Prather admitted in his trial testimony he struck Victim three times as necessary to defend against a larger man. Both Rabon and Prather testified Phillips had hit Victim earlier in the evening, and Rabon claimed to have seen Victim and Phillips in what appeared to be a sexual encounter. Prather testified Phillips hit and kicked Victim after Prather returned to the house and retrieved Phillips from the bedroom. According to Prather, Phillips went back inside to get his shoes while Prather waited in his car. At that point, it was within the jury's province to determine what version of events was more credible based on all the evidence and testimony.
LaRosa testified two people were present at the crime scene and manipulated the crime scene to present a particular version of events to authorities. Such expert testimony left little room for the jury to conclude anything other than that Prather was the second offender, as the State's theory of the case was that Prather and Phillips acted in concert to take advantage of Victim. See State v. Kromah , 401 S.C. 340, 357, 737 S.E.2d 490, 499 (2013) ("[A]lthough an expert's testimony theoretically is to be given no more weight by a jury than any **109 other witness, it is an inescapable fact that jurors can have a tendency to attach more significance to the testimony of experts."). Not only did LaRosa espouse his opinion as to the circumstances of the crime, he bolstered the credibility of his own testimony by stating his assessment of the case had been reviewed by other SLED agents who agreed with him. While Prather did not specifically object to this improper bolstering, the augmentation of LaRosa's credibility likely affected the weight given his testimony by the jury.
Finally, while not determinative in our analysis, the hung jury in Prather's previous trial supports our conclusion that LaRosa's testimony affected the outcome of this trial. See Christopher v. Florida , 824 F.2d 836, 847 (11th Cir. 1987) (stating the court's conclusion that the admission of defendant's confession in second trial was not harmless error was "buttressed" by defendant's first trial having ended in a hung jury); United States v. Ince , 21 F.3d 576, 585 (4th Cir. 1994) ("Had the case against [defendant] been as strong as the Government would have us believe, it seems unlikely that the first jury would have ended in deadlock."); United States v. Paguio , 114 F.3d 928, 935 (9th Cir. 1997) ("We cannot characterize the error as harmless, because the hung jury at the first trial persuades us that the case was close and might have turned on this [erroneously admitted] evidence."). According to Prather's brief, two new elements were introduced in his second trial. First, the State introduced redacted portions of Phillips' written statements in which the word rapist was spelled *426 "rapeist." The carving on Victim's backside was spelled correctly. Second, the State introduced LaRosa's testimony on reply. We cannot assign comparative weight to this new evidence and testimony or discern with certainty how each may have influenced the jury. However, we are not convinced beyond a reasonable doubt that LaRosa's improperly bolstered, expert testimony which implicitly pointed to Prather's involvement, did not contribute to the second jury's guilty verdict. That conclusion is buttressed by the previous hung jury.
We conclude the trial court erred in allowing LaRosa's testimony because it was not proper reply testimony. Furthermore, we conclude under the totality of the circumstances, the **110 admission of his testimony was not harmless. Therefore, we reverse and remand to the trial court for a new trial.[5]
REVERSED AND REMANDED.
LEE, A.J., concurs.

Prather's codefendant, Joshua Phillips, was also indicted for these charges, but he accepted a deal with the State to plead guilty to armed robbery and voluntary manslaughter.

Rabon testified he is half-deaf in one ear and sleeps very soundly if he falls asleep on that side.

382 S.C. 265, 273-74, 676 S.E.2d 684, 688 (2009) (explaining an expert may satisfy the qualification threshold and any "defects in the amount and quality of education or experience go to the weight to be accorded the expert's testimony and not its admissibility"; a trial court may take the same approach with the reliability factor "after making a threshold determination for purposes of admissibility").

We are not convinced by the dissent's citation to the following testimony that Prather testified one person committed the crime and associated acts, regardless of what the jury may have inferred from it.
"[State]: And Joshua Phillips was alone in the house for eight to ten minutes?"
"[Prather]: "Somewhere around there."
Prather's answer to the compound question is more responsive to the length of time that passed than the number of individuals in the house or what Phillips did while inside. The remaining testimony cited by the dissent is a basic denial of the crime. Additionally, the record demonstrates Victim's roommate remained in the house after Prather claims to have left.

Because our resolution of the prior issue is dispositive, we decline to address the remaining issues on appeal. See Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not address remaining issues when its resolution of a prior issue is dispositive). While we decline to rule on the reliability of crime scene analysis testimony in general, we find expert testimony that speculates on the motives and mindset of a perpetrator to be suspect, particularly when based on crime scene photographs, instead of viewing the crime scene in person, "some" of a codefendant's prior statements, and none of the mental health histories of the parties.