# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Robert Jared Prather, Respondent.

Appellate Case No. 2018-000753

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Lexington County
Clifton Newman, Circuit Court Judge

---

Opinion No. 27954
Heard March 5, 2019 – Filed March 11, 2020

---

### REVERSED

---

Attorney General Alan McCrory Wilson, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, Assistant Attorney
General Susannah Rawl Cole, and Assistant Attorney
General J. Anthony Mabry, all of Columbia; and Solicitor
Samuel R. Hubbard III, of Lexington, all for Petitioner.

Elizabeth Anne Franklin-Best, of Blume Norris &
Franklin-Best LLC, of Columbia, for Respondent.

---

**JUSTICE JAMES:** Robert Jared Prather was convicted of murder and strong arm robbery. The trial court sentenced Prather to concurrent prison terms of thirty years for murder and ten years for strong arm robbery. Prather appealed, and a divided court of appeals reversed and remanded the case for a new trial. *State v. Prather*, 422 S.C. 96, 810 S.E.2d 419 (Ct. App. 2017). We granted the State's petition for a writ of certiorari. We hold the trial court did not err in admitting the State's reply testimony, and we hold Prather's additional sustaining grounds are without merit. We therefore reverse the court of appeals and reinstate Prather's convictions.

## I.  FACTUAL AND PROCEDURAL HISTORY

At approximately 4:30 a.m. on April 22, 2005, Prather and Joshua Phillips presented to Lexington Medical Center and reported to an ER nurse that Gerald Stewart (Victim) had sexually assaulted Phillips. As detailed below, Prather told the nurse he had beaten Victim with his fists following the assault and that Victim was probably barely alive. Law enforcement officers were dispatched to both Lexington Medical and Victim's residence.

Police found Victim dead in his residence. He was clothed and kneeling face-down into his living room couch. His head was covered by a pillow and his body was covered by a blanket. The word "rapist" was carved into the small of Victim's back, and a dildo was found underneath his right armpit. Police found Victim's roommate, Rob Rabon, asleep in Rabon's bedroom. Rabon testified at trial he was asleep when Victim was murdered. An autopsy revealed Victim died from an irregular heartbeat caused by the stress of a beating and a pre-existing enlarged heart.

Prather and Phillips were indicted for murder, first-degree burglary, armed robbery, possession of a firearm or knife during the commission of a violent crime, and filing a false police report alleging the commission of a felony. Prather's first trial ended in a hung jury. Prather was then re-indicted for all the original charges except the weapon charge and the false police report charge. Phillips pled guilty to voluntary manslaughter and armed robbery after Prather's second trial. The trial court's various rulings during the second trial are the focus of this appeal.

During the second trial, Rabon testified he moved in with Victim about a week before the incident but was planning to move out after discovering Victim was homosexual. Rabon testified that on the evening before Victim died, he returned to Victim's residence and found Prather and Phillips with Victim. Rabon testified Phillips hit Victim in the face, busting Victim's lips. Rabon testified to later purchasing and using cocaine with Prather, drinking several beers, and retiring alone to his bedroom, as he had to go to work the following morning. Rabon testified he

later came out of his bedroom and saw Victim "kind of over" Phillips in the living room engaging in a sexual act of some kind. Rabon testified he later witnessed Victim and Phillips on Victim's bed and noted Victim was nude and Phillips was also nude or wearing very little. Rabon testified Prather was not in the residence during either encounter. Rabon testified he later heard Prather yelling for Phillips and heard Victim leave the residence with Prather. Rabon testified he is partially deaf in one ear and sleeps very soundly if he sleeps on his "good" ear. Rabon claimed he went to sleep and woke up to about "four cops standing over me."

Donna Sharpe, an ER nurse at Lexington Medical, testified Phillips and Prather presented to the emergency room at approximately 4:30 a.m. Sharpe testified her ensuing conversation with Prather and Phillips in the triage area was so alarming that she typed detailed notes of the conversation within an hour of its end. She testified Prather told her that he and Phillips were drinking at Victim's house, and that Prather left Phillips at the house and later returned. Sharpe testified Prather told her that when he (Prather) returned, Victim answered the door nude and asked Prather if he knew that Phillips liked receiving fellatio. Sharpe testified Prather told her he went inside the home and found Phillips wearing only his underwear. Sharpe testified Prather and Phillips admitted to beating up Victim, and Prather said to her, "He's probably still laying there."

Sharpe testified Prather then asked to wash his hands, and Sharpe told him he could use the sink there in the triage area. Sharpe testified that as Prather washed his hands, he "kind of chuckled" and said he did not like getting blood on his hands. Sharpe then asked Prather for Victim's address, and Prather asked Phillips, "Do you still have his wallet?" According to Sharpe, Phillips handed Victim's wallet to Prather, and Prather took Victim's identification card from the wallet and gave the wallet and card to her. Sharpe in turn gave these items to her supervisor, who gave them to law enforcement. Sharpe testified Prather asked her, "I'll probably go to jail for this, won't I?" Sharpe asked Prather if he was referring to him beating Victim; she stated Prather's response to her was, "[Y]es, I beat him. But he's alive though, maybe barely though."

Officer Brandon Field was dispatched to check on Victim and entered Victim's home through a partially open window. Field testified he found Victim dead "underneath a blanket, kind of on [his] knees, knelt down, like face-down on the couch." Paramedic Virginia Youmans testified the word "rapist" was carved on the small of Victim's back. South Carolina Law Enforcement Division (SLED) Agent Al Stuckey testified he discovered a dildo underneath Victim's right armpit. Of note in this appeal are (1) the placement of the blanket and pillow, (2) the carving of the word "rapist," and (3) the placement of the dildo under Victim's armpit.

Officer Ronald Suber spoke with Prather at Lexington Medical. Suber testified Prather told him that after he, Phillips, and Victim finished drinking, he left Phillips passed out on Victim's couch. Suber's testimony regarding Prather's account of his departure and return to Victim's home tracked Nurse Sharpe's testimony as recited above. Suber testified Prather told him the last time he entered Victim's home, he found Phillips asleep in a bedroom wearing only his underwear. Prather said he woke Phillips up by shaking him, yelling at him, and pulling his hair. Suber further testified Prather told him, "I beat the shit out of [Victim] and those were devastating blows."

Sergeant Wayne Kleckley testified he also spoke with Prather at Lexington Medical and that Prather told him he "beat the shit out of [Victim,]" and that he "laid some devastating blows on him." Kleckley testified Prather demonstrated by balling up his fist and striking the palm of his other hand.

Dr. Janice Ross, a pathologist, testified the cause of Victim's death was homicide; specifically, she testified Victim's pre-existing enlarged heart and the stress of being beaten caused cardiac arrhythmia (rapid heartbeat), which in turn caused Victim to die. She testified Victim suffered bruising around his left eye, a fractured nose, scratch marks on his right thigh, bruises underneath the skin on his right chest and upper abdomen, two fractured ribs on his left side, bruising to his scalp, bruises and lacerations on the inside of his lips, a superficial burn mark consistent with a cigarette burn to the middle finger of his right hand, and an abrasion around his knuckle. Dr. Ross was unable to rule out smothering as contributing to Victim's death since he was found face-down on a couch.

Police found a Coca-Cola collectible box on the front passenger-side floorboard of Prather's car. Victim's aunt testified Victim inherited the item from his father and that Victim treasured the item and would never part with it.

Prather testified he and Phillips visited Victim and drank with Victim throughout the day before Victim died. Prather testified that sometime after Rabon arrived at Victim's home, Phillips and Victim got into a fight, and Phillips hit Victim in his face, mouth, chest, and stomach. Prather testified Phillips later hit Victim in the mouth again. Prather testified he left and returned to Victim's residence and that he and Victim later went to a bar. Prather testified that after he took Victim back to Victim's residence, he left to try to find some cocaine for Victim. According to Prather, when he returned to Victim's residence, Victim emerged from his bedroom nude with an erection and asked Prather if he ever had sexual relations with Phillips and whether he knew Phillips enjoyed receiving fellatio. Prather testified Victim walked towards him and when Prather stated he was going to take Phillips home,

Victim responded that he was "not going any [expletive] where." Prather testified Victim grabbed his arm and that he hit Victim three times in self-defense.

Prather testified that when he woke Phillips up to take him home, he found a dildo on the bed by Phillips' feet. Prather testified Phillips hit Victim while they were looking for Phillips' clothes. Prather further testified that after he found Phillips' clothes, he and Phillips left Victim's residence, but Phillips went back inside to find his shoes. Prather testified he did not go back inside and that when he left Victim's residence, Victim was alive. Prather testified he waited for Phillips for about eight to ten minutes and that Phillips emerged from Victim's residence "walking really, really fast to the car" with something in his hands.

Prather denied telling Nurse Sharpe that Victim was barely alive. Prather further testified he did not beat Victim down onto the sofa, carve "rapist" into Victim's back, burn Victim's finger with a cigarette, cover Victim's body with the blanket, place the pillow over Victim's head, or place the dildo under Victim's armpit. Prather reiterated Phillips was alone in Victim's residence for about eight to ten minutes.

After the defense rested, the State called Paul LaRosa of SLED in reply as an expert in crime scene analysis. The State explained it did not intend to present LaRosa "to develop a profile or to say that anybody is consistent with that type of individual, just to explain the crime scene." The State contended *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009), and *State v. Tapp*, 398 S.C. 376, 728 S.E.2d 468 (2012), allowed such testimony.

During an *in camera* hearing, LaRosa testified he had been employed by SLED for eighteen years: from 1994 to 2000 as a special agent in the crime scene unit collecting and processing evidence and analyzing and reconstructing crime scenes based on collected evidence; from 2005 to 2010 as a violent crimes investigator; and from 2010 to 2012 as a criminal profiler assigned to the behavioral science unit. In the behavioral science unit, LaRosa completed a two-year understudy program that mirrored the Federal Bureau of Investigation (FBI) criminal profiler study program, with two court-qualified SLED crime scene analysts. He completed a thirty-day internship with the South Carolina Department of Mental Health (SCDMH) under a forensic psychiatrist and psychologist, completing rounds at psychiatric hospitals assessing patients. LaRosa completed a two-month internship with the FBI, working independently on an active case load that was peer-reviewed by FBI supervisors.

LaRosa testified *in camera* that he would combine forensics and crime scene reconstruction with the psychology and behavior exhibited at the crime scene to give an opinion as to the number of people present after the crime. LaRosa testified he reviewed photographs and a video of the scene; reports from first responders and law enforcement; the autopsy report; the transcript from the first trial; and at least one statement from Phillips, which he did not use in his analysis. LaRosa also watched Prather's trial testimony. LaRosa testified there were two phases at the crime scene evidencing two specific personalities: he testified the first phase was "staging," based on the carving and placement of the dildo, and the second phase was "undoing," based on the covering of Victim with a blanket and pillow. LaRosa testified two people were present during these phases because the two phases indicated two personalities. LaRosa testified he had not created a profile on Prather or Phillips because he did not have their past histories and psychological files. He also testified he would not be offering an opinion as to whether Prather "did anything."

Prather objected to LaRosa being qualified as an expert in crime scene analysis and to his proffered testimony. He first argued LaRosa's testimony was improper reply testimony because it did not purport to rebut anything presented by the defense. Prather also argued LaRosa was not qualified in the field of crime scene analysis and his testimony was not reliable.

The trial court found LaRosa's testimony was proper reply because it was in response to Prather's testimony as to who was with Victim at various times before and after Prather claimed he left the residence. The trial court concluded LaRosa's testimony was relevant, probative, and reliable on the issues of staging, directed anger, and covering, and the testimony would not invade the province of the jury by "pointing a finger to say who did what in this instance." The trial court cautioned the State that no suggestion could be made to the jury as to who did what at the scene.

LaRosa testified before the jury that offenders engage in "staging" to alter "the crime scene from what truly happened. It is to get law enforcement . . . on a different idea." He testified the carving and the placement of the dildo were two instances of staging at this crime scene. He concluded the carving was staging "because it doesn't impact the actual murder itself. . . . It's the offender's way of saying, hey, look at this guy. Not only is he a bad guy, he's bad enough that somebody's carving rapist in his back. I want the world to know that this guy is a rapist." LaRosa further testified the placement of the dildo underneath Victim's armpit was staging because it "had nothing to do with the murder." He concluded the placement of the dildo under Victim's armpit was done for "shock value."

LaRosa explained offenders use "undoing" to "symbolically erase what has happened" at a crime scene and that the covering of Victim with a blanket and pillow was "a classic case of undoing." LaRosa testified the staging and undoing in this case were in absolute conflict with one another, with one personality deciding in the heat of the moment to carve on Victim's back and place a dildo under his arm and the other personality using the blanket and pillow to erase what had just occurred.

LaRosa acknowledged there were three people other than Victim in Victim's house around the time of the murder (Rabon, Prather, and Phillips). He did not offer an opinion as to whether any of the three engaged in the staging or undoing. LaRosa also did not offer an opinion as to whether either the "staging" personality or the "undoing" personality participated in the murder, but he testified "there were specifically two people in there after the crime," one carving on Victim's back and placing the dildo, and the other placing the blanket and pillow over Victim.

The trial court denied Prather's motion for a directed verdict, and the jury convicted Prather of murder and strong arm robbery (a lesser-included offense of armed robbery). The trial court denied Prather's motion for a new trial, and Prather appealed.

A divided court of appeals reversed and remanded for a new trial. After the State petitioned for rehearing, the court of appeals withdrew its original opinion and issued a revised opinion. *State v. Prather*, 422 S.C. 96, 810 S.E.2d 419 (Ct. App. 2017). The majority held the trial court erred in admitting LaRosa's testimony because it was not proper reply testimony. *Id.* at 109, 810 S.E.2d at 426. The majority further held the erroneous admission of LaRosa's testimony was not harmless. *Id.* at 109-10, 810 S.E.2d at 426. Judge Williams dissented, concluding the trial court did not abuse its discretion in allowing LaRosa's reply testimony. *Id.* at 110, 810 S.E.2d at 426 (Williams, J., dissenting). Judge Williams did not express an opinion on the reliability of LaRosa's testimony, finding instead that the testimony did not prejudice Prather. Judge Williams also concluded Prather's remaining arguments had no merit. We granted the State's petition for a writ of certiorari.

## II. DISCUSSION

### A. ADMISSION OF REPLY TESTIMONY

The State argues the court of appeals erred in holding LaRosa's testimony was not limited to refuting Prather's testimony but was instead used to complete the State's case-in-chief. The State also contends the court of appeals erroneously held Prather could not have anticipated LaRosa's testimony.

Prather argues the court of appeals properly reversed the trial court because LaRosa's testimony extended beyond rebutting Prather's testimony and introduced an entirely new forensic science the defense could not have anticipated. Prather contends the State should have offered LaRosa's testimony during its case-in-chief.

As an additional sustaining ground, Prather argues the trial court abused its discretion in qualifying LaRosa as an expert in crime scene analysis and finding LaRosa's testimony reliable. Prather urges this Court to find "this area of 'forensic science' is not scientifically valid" because "this kind of testimony has not been scientifically validated and is extremely controversial." In addition, Prather argues the trial court abused its discretion in admitting LaRosa's testimony because the testimony improperly invaded the province of the jury because it related to Prather's intent. We will first address whether LaRosa's testimony satisfied the requirements of Rule 702 of the South Carolina Rules of Evidence, and we will then address whether LaRosa's testimony was proper reply testimony.

### 1. Rule 702, SCRE

We have previously referred to crime scene analysis testimony as non-scientific expert testimony. *See State v. Tapp*, 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012) (holding that although the law at the time of the trial "instructed that the reliability of nonscientific expert testimony was a determination to be made by the jury," under later case law, the trial court was required to evaluate the reliability of the State's proposed expert's testimony in crime scene analysis and victimology). Courts in other jurisdictions have concluded crime scene analysis is a body of specialized knowledge. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) ("The [crime scene analysis] testimony at issue in this case . . . is not based on scientific theory and methodology, but rather, is based on nonscientific 'specialized knowledge,' that is, the expert's experience."); *Simmons v. State*, 797 So. 2d 1134, 1151 (Ala. Crim. App. 1999) (internal citations omitted) ("Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. Therefore, because crime-scene analysis is not scientific evidence, we conclude that we are not bound by the test enunciated in *Frye*.").

Thus, before admitting non-scientific expert witness testimony, a trial court must determine whether: (1) the qualifications of the expert are sufficient and (2) the subject matter of the expert's testimony is reliable. *See State v. White*, 382 S.C. 265, 273-74, 676 S.E.2d 684, 688-89 (2009) (citing Rule 702, SCRE). "The qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's sound discretion." *State v. Chavis*, 412 S.C. 101, 106, 771 S.E.2d

336, 338 (2015). "A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." *Id.* "An abuse of discretion occurs when the conclusions of the [trial] court are either controlled by an error of law or are based on unsupported factual conclusions." *Id.*

### a. LaRosa's Qualifications

"The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject." *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004). "To be competent to testify as an expert, 'a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.'" *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252-53, 487 S.E.2d 596, 598 (1997) (quoting *O'Tuel v. Villani*, 318 S.C. 24, 28, 455 S.E.2d 698, 701 (Ct. App. 1995), *overruled on other grounds by I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000)).

As noted above, LaRosa testified of his eighteen-year employment history with SLED and his extensive experience in crime scene analysis. His qualifications include two years of training with the FBI in its criminal profiler study program, his internship with a SCDMH forensic psychiatrist and psychologist (and his continuing relationship with SCDMH), as well as another internship with the FBI, during which he worked on active cases under peer-review by FBI supervisors. LaRosa testified he had been qualified as an expert in crime scene reconstruction and assessment in federal court and in general sessions court. He testified that in this case, he would combine forensics and crime scene reconstruction with the psychology and behavior exhibited at the instant crime scene to give an opinion only as to the number of people present after the crime had been committed.

We hold the trial court did not abuse its discretion in finding LaRosa was qualified as an expert in crime scene analysis.

### b. Reliability of LaRosa's Testimony

Before admitting expert testimony, a trial court must qualify the expert and determine whether the subject matter of the expert's proposed testimony is reliable, as required by Rule 702, SCRE. *See Tapp*, 398 S.C. at 388-89, 728 S.E.2d at 474-75; *see also White*, 382 S.C. at 273, 676 S.E.2d at 688 ("Nonscientific expert testimony must satisfy Rule 702, both in terms of expert qualifications and reliability of the subject matter."). In *Tapp*, the trial court determined a witness was qualified in the field of crime scene analysis, but we held the trial court erroneously allowed

the jury to resolve the question of whether his testimony was reliable. 398 S.C. at 389, 728 S.E.2d at 475. As noted above, even though we concluded the trial court erred in admitting the testimony without first resolving the threshold reliability issue, we held this error was harmless because the witness's testimony could not have contributed to the verdict. *Id*. at 390, 728 S.E.2d at 476. We have not had the occasion to review a trial court's finding that a crime scene analysis expert's testimony was reliable.

The trial court found LaRosa's testimony to be "sufficiently reliable to be admitted," as required by Rule 702, SCRE, and *Tapp*. However, the court of appeals' majority found "expert testimony that speculates on the motives and mindset of a perpetrator to be suspect, particularly when based on crime scene photographs, instead of viewing the crime scene in person, 'some' of a codefendant's prior statements, and none of the mental health histories of the parties." *Prather*, 422 S.C. at 110 n.5, 810 S.E.2d at 426 n.5.

As noted, LaRosa testified as to the phases of staging and undoing and the purposes of those acts. This type of testimony has been admitted as reliable crime scene analysis testimony in other jurisdictions. *See Stevens*, 78 S.W.3d at 829, 831, 835 (upholding the trial court's decision to limit an FBI expert's testimony to his analysis of the evidence found at the crime scene, including testimony regarding the staging of the crime scene and the possibility that the homicides were committed by more than one offender); *People v. Jackson*, 165 Cal. Rptr. 3d 70, 75, 83-84 (Cal. Ct. App. 2013) (holding an FBI agent's testimony was "an indisputably admissible class of evidence," where the agent performed a crime scene assessment that was "irrespective of who committed the crime," and "[t]he purpose of his analysis was to behaviorally and forensically assess the crime and crime scene dynamics through the interaction of the offender or offenders, [the victim], and the location, in order to determine whether the crime scene had been staged, to focus on why the homicide occurred, and if an opinion could be rendered as to the offender's motive").

Prather argues LaRosa's testimony amounted to a "criminal profile" and that criminal profiling is useful only as an investigative tool and is not sufficiently reliable to be admitted as expert testimony. A criminal profile is "a collection of conduct and characteristics commonly displayed by those who commit a certain crime." *People v. Robbie*, 112 Cal. Rptr. 2d 479, 484 (Cal. Ct. App. 2001). "A profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." *United States v. McDonald*, 933 F.2d 1519, 1521 (10th Cir. 1991). "[T]he syllogism underlying profile evidence [is that]

criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal." *Robbie*, 112 Cal. Rptr. 2d at 485.

An example of a criminal profile can be found in *State v. Spann*, 334 S.C. 618, 513 S.E.2d 98 (1999). In *Spann*, an expert in crime scene analysis and criminal personality profiling testified on behalf of the defendant and "profiled the killer of [ ] three women as a white male in his mid-20's to mid-30's with a history of mental illness, who was either single or had a dysfunctional marriage, a person with bizarre fantasies, a history of child abuse, and knowledge of the area." *Id.* at 621, 513 S.E.2d at 100. We did not approve profiling testimony in *Spann*; we simply noted in *Spann* that the defendant did not fit the expert's criminal profile.

LaRosa did not examine the mental health histories of either Prather or Phillips, nor did he create criminal profiles for them. He also did not offer an opinion as to what either man did or did not do at the scene. LaRosa's testimony <u>cannot</u> be construed as drawing conclusions regarding the type of person(s) who committed the murder or the type of persons who carved on Victim's back and covered his body. Such testimony has been excluded in other jurisdictions as unreliable. *See Stevens*, 78 S.W.3d at 835 (holding the portion of the crime scene analysis expert's conclusions as to the type of individual who committed the crime based on the physical evidence found at the scene was unreliable and therefore inadmissible). LaRosa testified in general terms regarding the number of persons "in there after the crime" and never mentioned Prather's, Phillips', or Rabon's names. His testimony demonstrated the conflicting personalities of someone who staged the crime scene (carving and placement of the dildo) and someone who undid the crime scene (covering Victim). Importantly, LaRosa acknowledged he could not tell who participated in the killing of Victim. We conclude LaRosa's testimony did not rise to the level of criminal profiling.

Unlike the court of appeals, we do not consider vital the fact that LaRosa did not visit the crime scene, reviewed only a portion of Phillips' statements to law enforcement, and did not review anyone's mental health history. The photographs and other information the State provided to LaRosa evidenced the superficial carving, the murdered Victim, and the placement of the pillow, blanket, and dildo— the pertinent information LaRosa needed to render his opinions. As we have stated several times, LaRosa's opinions went only to the number of personalities "in there after the crime." LaRosa did not offer an opinion as to whether either personality murdered Victim, and he did not offer an opinion as to whether Rabon, Prather, or Phillips were involved in the staging or undoing. The mental health histories of Rabon, Prather, and Phillips were of no consequence to LaRosa's testimony on this point.

We hold the trial court did not err in finding LaRosa's crime scene analysis testimony reliable. We share the reluctance of many courts to admit expert testimony in a criminal trial that rises to the level of a "criminal profile" of the perpetrator. We are also mindful that "'[p]rofile' testimony and permissible expert opinion overlap, which underscores the necessity of objecting to questionable testimony during trial so that the trial court can limit any objectionable 'profile' aspect and channel the testimony toward admissible expert opinion instead." *State v. Avendano-Lopez*, 904 P.2d 324, 327 (Wash. Ct. App. 1995). Our holding shall in no way be considered as our approval of criminal profiling evidence in the courts of this State.

## 2. Scope of Reply Testimony

"The admission of reply testimony is a matter within the sound discretion of the trial judge." *State v. Stewart*, 283 S.C. 104, 106, 320 S.E.2d 447, 449 (1984). "The admission of testimony which is arguably contradictory of and in reply to earlier testimony does not constitute an abuse of discretion." *Id.* Rather, "[a]n abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Jones*, 416 S.C. 283, 290, 786 S.E.2d 132, 136 (2016).

"Reply testimony should be limited to rebuttal of matters raised by the defense." *State v. Huckabee*, 388 S.C. 232, 242, 694 S.E.2d 781, 786 (Ct. App. 2010). "Any arguably contradictory testimony is proper on reply." *State v. South*, 285 S.C. 529, 535, 331 S.E.2d 775, 779 (1985).

In *State v. McDowell*, we held the trial court did not abuse its discretion in permitting the examining pathologist to testify on reply that the murder victim's head was resting against a hard, flat object at the time the third shot was fired. 272 S.C. 203, 206-07, 249 S.E.2d 916, 917 (1978). The defendant argued the State was required to introduce the pathologist's testimony during its case-in-chief, and therefore, the testimony was improper. We held the pathologist's testimony was proper reply testimony to the defendant's testimony that the victim was standing when he fired the third shot, which was in direct opposition to his earlier statements. *Id.* We reasoned the pathologist's testimony was unnecessary until the defendant contradicted his statement to law enforcement that the victim was lying on the floor when he (the defendant) fired the last shot. *Id.*

Here, the court of appeals' majority distinguished this case from *McDowell* and other cases, stating "[u]nlike [those] cases, LaRosa's testimony was not proper reply testimony because the rebuttal should have been limited to refuting Prather's

testimony, rather than to complete the State's case-in-chief." *Prather*, 422 S.C. at 106, 810 S.E.2d at 424. The majority cited Prather's testimony that he waited in his vehicle for Phillips for about ten minutes and that he denied carving anything into Victim's back or covering him with a blanket. The majority noted Prather did not testify to the number of perpetrators or as to anyone's motive for the carving, the placement of the dildo, or the covering of Victim. *Id.* at 107, 810 S.E.2d at 424. The majority also concluded LaRosa's "broad expert testimony" "explain[ing] the crime scene" could not reasonably be anticipated by Prather. *Id.* at 107, 810 S.E.2d at 424.

We disagree. Prather testified that when he and Phillips left Victim's residence, Victim was alive, walking around, not mutilated, not covered, and not face-down in the couch. Prather further testified that Phillips went back inside the residence to find his shoes, leaving Prather in the car. The inferences arising from Prather's testimony are obvious—when Phillips went back inside the dwelling, he was alone with Victim, thus placing blame for the crimes solely upon Phillips. LaRosa's testimony provided another explanation for the number of people present immediately after Victim was murdered. Consequently, until Prather testified that Victim was alive, was not mutilated, and was not covered just before Phillips went back inside, LaRosa's testimony was unnecessary, much like the pathologist's testimony in *McDowell*.

At the least, LaRosa's testimony was "arguably contradictory" to Prather's testimony. *See South*, 285 S.C. at 535, 331 S.E.2d at 779 ("Any arguably contradictory testimony is proper on reply."). Although Prather did not testify about the motivation for someone to carve "rapist" into Victim's back or to cover Victim's body, LaRosa's testimony of the motives for staging and undoing was necessary to his conclusion that the two separate behaviors evidenced two conflicting personalities. This provided the foundation for LaRosa's testimony that two people were present after the crime and countered Prather's testimony that only one person was present at that time. *See State v. Durden*, 264 S.C. 86, 90, 212 S.E.2d 587, 589 (1975) ("The reply testimony was made necessary by the evidence which the appellant had submitted. The reply testimony did not go beyond a refutation of that which the appellant's witness had asserted. It can hardly be argued that the appellant's counsel was taken by surprise.").

### 3. Province of the Jury

We also reject Prather's argument that LaRosa's testimony invaded the province of the jury by improperly injecting evidence of Prather's intent. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable

because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, SCRE. Such testimony is admissible, "so long as the expert does not opine on the criminal defendant's state of mind or guilt or testify on matters of law in such a way that the jury is not permitted to reach its own conclusion concerning the criminal defendant's guilt or innocence." *State v. Commander*, 396 S.C. 254, 269, 721 S.E.2d 413, 421 (2011).

Again, LaRosa testified there were two personalities present "after the crime." LaRosa did not directly or indirectly compare Prather's behavior to either of those personalities, and LaRosa did not offer an opinion as to who committed the murder. LaRosa's testimony allowed the jury to reach its own conclusion regarding Prather's state of mind.

We hold the trial court did not err in admitting LaRosa's testimony.

## B. ADDITIONAL SUSTAINING GROUNDS

Since the court of appeals held the introduction of LaRosa's reply testimony was reversible error, the majority declined to address a number of other issues Prather raised on appeal. Prather has presented five of those issues to this Court as additional sustaining grounds.

### 1. Prosecutorial Misconduct and Due Process Violation

We find unpreserved Prather's argument that the State committed prosecutorial misconduct and violated his right to due process when it "sandbagged" the defense with LaRosa's rebuttal testimony. Prather never raised prosecutorial misconduct or due process concerns at trial. He had the opportunity to do so during the *in camera* hearing concerning the admissibility of LaRosa's testimony and at the time LaRosa testified at trial. The first time Prather raised these issues was during his post-trial motion for a new trial. *See State v. Holmes*, 320 S.C. 259, 266, 464 S.E.2d 334, 338 (1995) (providing new trial motions may not be used to raise evidentiary issues for the first time).

### 2. Confrontation Clause Violation

We find unpreserved Prather's arguments that the trial court abused its discretion in allowing the State to introduce into evidence portions of Phillips' statements to law enforcement because they were inadmissible hearsay, they were unreliable, and they were irrelevant. Phillips did not testify, and during trial, Prather asserted only a Confrontation Clause violation. We will therefore address only that

argument. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) (internal citation omitted) ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge. . . . A party may not argue one ground at trial and an alternate ground on appeal.").

As noted above, the word "rapist"—correctly spelled—was carved into Victim's low back. The State introduced two one-word cutouts from Phillips' six-page handwritten statement to law enforcement. The cutouts showed he twice misspelled the word "rapist" as "rapeist." Nothing else from Phillips' statement was introduced into evidence. Captain Mark Jones testified he witnessed Phillips write the statement and neither asked Phillips to write the word nor told Phillips how to spell it. Captain Jones testified he did not inform Phillips of the import of the word, but Jones admitted he did not know if Phillips misspelled the word on purpose.

Phillips did not testify during Prather's trial. Prather argues Phillips' statement to law enforcement was testimonial and that the State's use of only the two one-word cutouts of the word "rapeist" did not diminish the overall testimonial nature of the cutouts. Prather contends the State used the cutouts to show he carved the word "rapist" on Victim's back. Prather argues a Confrontation Clause analysis does not depend on the character of the evidence, but on its purpose. We hold Prather's confrontation rights were not violated.

"The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.'" *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (quoting U.S. Const. amend. VI). This constitutional guarantee includes the right to cross-examine those witnesses. *State v. McDonald*, 412 S.C. 133, 139, 771 S.E.2d 840, 843 (2015). A defendant's rights under the Confrontation Clause are violated, even if a cautionary instruction is given, when a non-testifying codefendant's statement that expressly inculpates a defendant is admitted at trial. *See Bruton v. United States*, 391 U.S. 123, 135-36 (1968).

"The [United States Supreme Court], in *Richardson v. Marsh*, specifically declined to extend this rule to the situation when a defendant's name or any reference to defendant is redacted, even though the statement's application to him is linked up by other evidence properly admitted against the defendant." *State v. Evans*, 316 S.C. 303, 307, 450 S.E.2d 47, 50 (1994). However, in *Gray v. Maryland*, the United States Supreme Court found that "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton's* protective rule" since it "refers directly to the 'existence' of the nonconfessing codefendant." 523 U.S. 185, 192 (1998).

In *State v. Evans*, the defendant was convicted of charges arising from a deadly automobile accident. 316 S.C. at 306, 450 S.E.2d at 49. A State's witness testified the only passenger in the defendant's vehicle discussed the accident with him and made the statement, "I wasn't driving anyway." *Id.* The defendant argued the statement implicated him as the driver and, because the passenger did not testify at trial, the admission of this testimony was a violation of the Confrontation Clause. *Id.* at 306-07, 450 S.E.2d at 49-50. We disagreed, holding the admission of the statement was not a Confrontation Clause violation because "[t]he statement did not 'on its face' incriminate [the defendant], although its incriminating import was certainly inferable from other evidence that was properly admitted against him." *Id.* at 307, 450 S.E.2d at 50.

Most of our State's recent jurisprudence regarding Confrontation Clause violations focuses on the admissibility of a co-defendant's full-confession implicating another party with insufficient redactions. *See McDonald*, 412 S.C. at 141, 771 S.E.2d at 844 (finding a nontestifying codefendant's confession insufficiently redacted by replacing a defendant's name with the phrase, "another person"); *State v. Henson*, 407 S.C. 154, 158, 166, 754 S.E.2d 508, 510, 514 (2014) (finding the State's use of a nontestifying codefendant's confession that replaced the defendant's name with "the guy," "he," and "him" violated the Confrontation Clause because it was inferable without relying on other evidence that the confession referred to and incriminated the defendant).

We hold the redaction of Phillips' statement to the point where only the word "rapeist" remained rendered the evidence nontestimonial. *See Crawford v. Washington*, 541 U.S. 36, 51 (2004) (providing testimony is generally a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" (quoting 2 N. Webster, An American Dictionary of the English Language (1828))). The word "rapeist" did not infer anything about what specifically transpired that night or who killed Victim. Like the statement in *Evans*, the word "rapeist" did not incriminate Prather on its face. Although the incriminating nature of the single misspelled word could be inferred in light of the other evidence presented at trial (specifically that the word was spelled correctly as carved on Victim's back), the word did not facially incriminate Prather. We therefore reject Prather's Confrontation Clause argument.

### 3. Directed Verdict

Prather argues the trial court erred in denying his motion for a directed verdict as to the murder charge because the evidence did not rise above a "mere suspicion" that Prather caused Victim's death. Prather contends Victim could have died at any

time despite Prather's physical assault on Victim; in support of this proposition, Prather cites the presence of drugs and alcohol in Victim's system and Victim's obesity, enlarged heart, and cirrhosis of the liver.

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Hernandez*, 382 S.C. 620, 624, 677 S.E.2d 603, 605 (2009). "In an appeal from the denial of a directed verdict motion, the appellate court must view the evidence in the light most favorable to the State." *State v. Cope*, 405 S.C. 317, 348, 748 S.E.2d 194, 210 (2013). We must affirm the trial court's decision to submit the case to the jury if there is any direct or substantial circumstantial evidence reasonably tending to prove the defendant's guilt. *Id.* However, we must reverse if the evidence only gives rise to a mere suspicion of the defendant's guilt. *See Hernandez*, 382 S.C. at 625, 677 S.E.2d at 605. "'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *State v. Buckmon*, 347 S.C. 316, 322, 555 S.E.2d 402, 404-05 (2001).

In *State v. Burton*, 302 S.C. 494, 397 S.E.2d 90 (1990), we discussed the issue of proximate cause in homicide cases. "The defendant's act may be regarded as the proximate cause if it is a contributing cause of the death of the deceased. The defendant's act need not be the sole cause of the death provided that it be a proximate cause actually and contributing to the death of the deceased." *Id.* at 496-97, 397 S.E.2d at 91. A person "is deemed to be guilty of the homicide if the injury inflicted contributes immediately to the death of the deceased." *Id.* at 498, 397 S.E.2d at 92.

Here, Victim's numerous injuries included cuts to his lower back, two fractured ribs, a fractured nose, bruising to his face, head, and body, and a burn mark on his finger. The pathologist testified the beating Victim endured caused him to die, though she could not rule out smothering as a contributing factor because of the position of Victim's body on the couch. The evidence as a whole raises the inference that he was left in that position as a result of the beating. ER nurse Sharpe testified Prather told her he beat Victim, that Victim was "probably still laying there," and that Victim was alive, "maybe barely though." Sergeant Kleckley and Officer Suber both testified they interviewed Prather at the ER and that Prather told them: "I beat the shit out of [Victim]" with "devastating blows."

The State presented sufficient evidence to establish Victim's death was caused by a severe beating perpetrated by Prather. The trial court properly denied Prather's motion for a directed verdict as to the murder charge.

## 4.  The State's Supposed Pursuit of Inconsistent Theories

Phillips pled guilty to voluntary manslaughter and armed robbery one week after Prather was convicted.[1]  Prather claims the State presented facts during Phillips' plea hearing that were inconsistent with the State's presentation of evidence and theories during Prather's trial.  Prather primarily claims the State advanced inconsistent theories as to who carved "rapist" on Victim's back.  We find this argument unpreserved.  We acknowledge Prather could not have raised this issue to the trial court until after Phillips pled.  However, Prather also failed to raise this issue in his post-trial motion for a new trial and supporting memorandum, the latter of which was filed over a month after Phillips' guilty plea.  *See Dunbar*, 356 S.C. at 142, 587 S.E.2d at 693 ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge.").

## 5.  Statement from an Unavailable Witness

During trial, Prather attempted to introduce into evidence a written statement given to law enforcement by Ralph Jody Webb Becknell, a purported witness who died prior to Prather's trial.  The document itself is not in the record, but the colloquy between defense counsel and the trial court indicates Becknell gave a statement to law enforcement on April 22, 2005.  Becknell evidently stated he had a phone conversation with Victim between 9:15 p.m. and 10:00 p.m. on the night of the killing.  The colloquy further indicates Becknell stated Victim told him his ribs were hurting.  Prather contends this would establish Victim sustained significant blows to his ribs several hours before Prather struck Victim with his fists.

The trial court ruled the statement was inadmissible hearsay.  Prather contends the statement was admissible as a present sense impression under Rule 803(1) of the South Carolina Rules of Evidence or as an excited utterance under Rule 803(2), SCRE, and would have corroborated his defense that he was not responsible for Victim's death.  We hold the trial court properly excluded Becknell's statement.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Rule 801(c), SCRE.  "Hearsay is not admissible except as provided by [the South Carolina Rules of Evidence] or by other rules prescribed by the Supreme Court of this State or by statute."  Rule 802, SCRE.  Here, we have hearsay included

---

[1] Phillips pled under the theory of accomplice liability, with Prather as the principal actor.  We detect no inconsistency in the core facts presented during Phillips' plea.

within hearsay, as Victim's statement to Becknell was hearsay, and Becknell's statement to law enforcement was hearsay. Hearsay included within hearsay is not necessarily inadmissible; such may be admitted if each part of the combined statements satisfies an exception to the hearsay rule. *See* Rule 805, SCRE.

Rule 803, SCRE, contains many exceptions to the rule against hearsay, regardless of whether the declarant is available as a witness. Prather argues Victim's statement to Becknell that his ribs were hurting was admissible under Rule 803(1) as a presence sense impression. Rule 803(1) defines a present sense impression as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." To qualify as a present sense impression: "(1) the statement must describe or explain an event or condition; (2) the statement must be contemporaneous with the event; and (3) the declarant must have personally perceived the event." *State v. Hendricks*, 408 S.C. 525, 533, 759 S.E.2d 434, 438 (Ct. App. 2014).

Prather argues Victim's statement to Becknell was also admissible under Rule 803(2) as an excited utterance, which the rule defines as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." For a statement to be an excited utterance: "(1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition." *State v. Washington*, 379 S.C. 120, 124, 665 S.E.2d 602, 604 (2008). "[T]he intrinsic reliability of an excited utterance derives from the statement's spontaneity which is determined by the totality of the circumstances surrounding the statement when it was uttered." *Ladner*, 373 S.C. at 119-20, 644 S.E.2d at 693.

Even if Victim's statement to Becknell was a present sense impression under Rule 803(1) or an excited utterance under Rule 803(2), Becknell's statement to law enforcement clearly does not fall within either exception. As for Rule 803(1), Becknell, as the declarant to law enforcement, did not personally perceive the event causing Victim's pain and his statement to law enforcement was not contemporaneous with the event. As for Rule 803(2), there is no evidence whatsoever that Becknell gave his statement to law enforcement while he was under stress or excitement of any kind. Therefore, the trial court did not err in excluding Becknell's written statement.

### III.   CONCLUSION

We hold the trial court did not err in admitting Agent LaRosa's reply testimony, and we reject each of Prather's additional sustaining grounds. We therefore reverse the court of appeals and reinstate Prather's convictions and sentences.

**REVERSED.**

**BEATTY, C.J. and KITTREDGE, J., concur. FEW, J., dissenting in a separate opinion in which HEARN, J., concurs.**

**JUSTICE FEW:** I agree with the majority that the subject matter of Agent LaRosa's testimony—that two different people acted on this crime scene—was a proper subject of reply testimony after Prather clearly suggested in his testimony that Phillips acted alone. I also agree the State presented sufficient evidence to support the trial court's conclusion that LaRosa is qualified as an expert in crime scene analysis. I disagree, however, that the opinions LaRosa actually gave—which go far beyond the subject of crime scene analysis—should have been admitted into evidence in this case. I would affirm the court of appeals in result.

When the State called LaRosa to testify in reply, it informed the trial court it was doing so "just to explain the crime scene." However, the State also told the trial court LaRosa would "describe[] the behavior and the motives of the people who have committed a crime." Testimony regarding the "behavior" of the person who committed the crime is crime scene reconstruction. *See State v. Ellis*, 345 S.C. 175, 177-78, 547 S.E.2d 490, 491 (2001) (officer qualified as an expert in crime scene processing and fingerprint identification was qualified to testify to measurements taken at the scene, recovery of shell casings, and identification of blood stains, but was not qualified to testify regarding the location and position of the victim's body at the time of the injury based on crime scene reconstruction). Testimony regarding the motives of the person who committed the crime is forensic psychology, and no expert may testify to the state of mind of a criminal defendant. *See State v. Commander*, 396 S.C. 254, 269, 721 S.E.2d 413, 421 (2011) (holding an "expert [may] not opine on the criminal defendant's state of mind or guilt").

In his actual testimony, LaRosa gave opinions that go far beyond crime scene analysis. For example, he testified that carving "rapist" in the victim's back shows what the perpetrator was thinking. He testified,

> It's the offender's way of saying, "hey, look at this guy. Not only is he a bad guy, he's bad enough that somebody's carving 'rapist' in his back. I want the world to know that this guy is a rapist." Whether or not that is what they believe, I can't say, but they want to project that to the first responders that this guy's a rapist.

He also gave his opinion that the perpetrator intentionally placed the dildo under the victim's armpit with the intent of creating "shock value to show what type of rapist he is." He then testified that, in his opinion, a different person engaged in "undoing" with the intent of "symbolically erasing what has occurred." He then went on to give his opinion that the two different actors at this crime scene were different personalities with different emotions.

> They are in absolute conflict with each other. You have this . . . detailed staging of taking the time to carve the word rapist in the back of the victim and then placing the adult sex toy next to him to show first responders that this guy is a rapist. "Hey, look at this." They are yelling. They are expressing this is the way I want this guy to be portrayed, as a rapist. Then you have another personality that goes in and says, "I'm not comfortable with that. I'm going to undo it, cover it up." You have two distinct personalities which points us to me and my opinion that you have two different offenders within that scene at the same time.

The subject matter of Agent LaRosa's testimony was a proper subject of reply testimony, and the State presented sufficient evidence to qualify him as an expert in crime scene analysis. However, the opinions LaRosa actually testified to went well beyond crime scene analysis to the state of mind of a criminal defendant.

**HEARN, J., concurs.**