**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Angelita Wright, Appellant.

Appellate Case No. 2017-002531

Appeal From Spartanburg County
R. Keith Kelly, Circuit Court Judge

Opinion No. 2023-UP-119
Heard June 2, 2020 – Filed March 22, 2023

**AFFIRMED**

Jordan Christopher Calloway, of McGowan Hood & Felder, LLC, of Rock Hill, and Chief Appellate Defender Robert Michael Dudek, of Columbia, both for Appellant.

Attorney General Alan McCrory Wilson, Senior Deputy Attorney General Donald J. Zelenka, Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General W. Edgar Salter, III, all of Columbia; and Solicitor Barry Joe Barnette, of Spartanburg; all for Respondent.

**MCDONALD, J.:**  Angelita Wright and the victim, Brent Tessnear (Victim), were previously married and had three children together.  At the time of Victim's death, the two had been estranged for approximately two years.  Wright now appeals her conviction for Victim's murder, arguing the circuit court erred in qualifying a police officer as an expert in cell phone forensic analysis and mapping.  Wright further contends the officer's testimony exceeded the scope of permissible rebuttal and she was prejudiced by its improper admission.  We affirm Wright's conviction.

**Facts and Procedural History**

On December 26, 2015, several witnesses saw Wright driving a white Ford F-150 pickup truck with Brandon Blackwood as her passenger.  Wright was on her way to Cowpens to see Victim so she could retrieve their children's Christmas gifts from his home.  Wright entered Victim's home and was upset upon her return to the truck because she believed Victim had returned the children's gifts, taken the money, and "bought drugs with it."  Later that day, Wright learned Victim had posted sexually explicit photos of her on Facebook.  Over the course of the evening and into the night, Wright and Blackwood visited several of Wright's friends, who testified Wright was angry at Victim and making comments threatening to kill him.  That night, Wright and Blackwell drove around Cowpens, Pacolet, Spartanburg, and Cherokee County looking for Victim.

Between 2:45 a.m. and 3:00 a.m. on December 27, motorists on Cemetery Street in Cowpens found Victim's body on the road.  Pathologist David Wren reported the cause of death as "internal hemorrhage secondary to lacerated liver and kidneys, secondary to blunt force trauma."  Dr. Wren testified Victim's injuries were consistent with a pedestrian being struck by a vehicle.

A Spartanburg County grand jury indicted Wright for Victim's murder.  Although her trial was initially scheduled for January 9, 2017, the case was continued after Blackwood markedly changed his statement during a pretrial meeting with an assistant solicitor and Investigator Thomas Clark of the Spartanburg County Sheriff's Office (SCSO).  During this meeting, Blackwood confessed he was driving the truck when it struck Victim.  Based on this confession, the State served Blackwood with an arrest warrant for Victim's murder.

At Wright's November 2017 trial, Blackwood testified he did not know Victim but had known Wright for five months prior to the fatal collision.  Blackwood explained that he went with Wright to Victim's Cowpens home on the afternoon before Victim's death because Wright needed a ride to pick up her children's

Christmas gifts.  After the pair left Victim's home, they drove to Pacolet, stopped by a store to buy cigarettes and alcohol, and then visited Carol Barzilay's house.  Blackwood, who was twenty years old at the time of trial, claimed he drank "about half of the bottle" of Coconut Malibu rum while the two drove around in his truck.

Blackwood testified Wright suddenly became "furious, enraged" while at Barzilay's house upon learning Victim had posted photos of her "private parts" on Facebook.  According to Blackwood, Wright stated Victim had about two minutes to take the pictures down or she was "going to have to find somebody and go and beat his ass."  Blackwood then rode with Wright to a friend's house in Cherokee County where Wright asked the friend to call her brother and enlist his help with beating up Victim; Wright also attempted to call her brother.  At this point Wright was driving because Blackwood was too intoxicated to drive.

Wright and Blackwood then returned to Victim's home where Wright "started knocking and yelling, Brent, where are you at, Brent, you know, yelling for him trying to figure out where he was."  When Wright received no response to her commotion, she became frustrated and returned to the truck.  Blackwood testified his friend Jonathan then pulled up and Wright asked Jonathan if he had seen Victim.  As Jonathan had not seen Victim, he called his friend Chavis, to ask where Victim might be, but Chavis had not seen him either.  The group then went to Chavis's house for about forty-five minutes before Wright and Blackwood walked back to Victim's home.  After again receiving no response at Victim's front door, Wright entered through a back door and retrieved a bicycle with training wheels for her son.

The two then went to Tammy Yosa's house in Wright's search for her ex-husband.  Blackwood testified he could not remember where they went after that, but the next place he recalled being that night was a Spinx gas station in Spartanburg where Wright met some friends.  While Blackwood remained in the passenger's seat, Wright exited the truck, got into her friend's car, and told Blackwood to "pull over to the Arby's" about a mile down the road.  Blackwood complied, waited for ten minutes while Wright and her friends talked, and then told Wright he needed to go home because he had already missed his midnight curfew.  Wright again drove the truck after telling Blackwood he was too drunk to drive.  Blackwood claimed he fell asleep in the passenger seat and woke up as Wright was getting out of the truck at a Li'l Cricket in Cowpens.

Blackwood then described Wright's encounter with Victim as Victim exited the convenience store.  He testified the two "seemed to be in a heated argument"

because they were "throwing their hands up, and she was yelling at him and he was yelling at her."[1]  Wright then returned to the driver's side of the truck and drove away from the store.  Initially, Blackwood claimed to recall only that he woke to Wright shaking him as they pulled into her driveway in Pacolet.  Upon further questioning, however, he described the events that occurred as the truck left the Li'l Cricket.  Blackwood admitted that as Wright drove, he saw "a figure of a man walking in the road" and told her to "watch out, there's a man in the road."

The State then refreshed Blackwood's recollection with his prior statement.  After reviewing his statement, Blackwood admitted he told Wright, "Make sure you don't hit him."  Blackwood continued:

> And she turned—she turned her bright lights on to see—I guess she was trying to see who it was.  I'm not really sure.  And she turned around—she turned.  And when he turned around and he looked, and when he looked she must've—she must have realized before I did who it was.  And when she did she put—she put her foot to the floor.

Blackwood testified Wright struck Victim with the pickup truck and did not stop.  He claimed he then passed out again and Wright woke him between 2:00 a.m. and 3:00 a.m. as the two were parking in Wright's driveway. Blackwood put the child's bicycle on her porch and drove home to Cherokee County.

Blackwood did not call the police or otherwise report Victim's death.  Less than twenty-four hours after the collision, Wright texted Blackwood, "You in town?  I was walking to the store.  LOL."  Law enforcement contacted Blackwood on December 29, and while he was on his way to the police station to give a statement, Wright texted him, "You need to call me ASAP."

In his initial statement to law enforcement, Blackwood indicated Wright was driving the truck and ran down Victim; however Blackwood gave conflicting statements, changing his story in the months between the vehicular homicide and Wright's trial.  Regarding his sudden confession during the pretrial meeting with the assistant solicitor and investigator, Blackwood claimed he "smoked some

---

[1] Neither the police sergeant who encountered Victim at the Li'L Cricket nor the store employee on duty that night observed such an argument, and video surveillance from the store was lost before law enforcement could review it.

weed" before this meeting and "was intimidated and scared into writing a false confession." He acknowledged his earlier claim that he did not remember whether Wright was with him in the truck when Victim was struck, but testified at trial that he was "absolutely sure" Wright was driving.

On cross-examination, Blackwood admitted that following his sudden confession in the pretrial meeting, he wrote out seven pages in which he indicated he "had swerved, run off the road, and when [he] ran back on the road somebody was on the hood of the car and [he] didn't mean to hit him." This conflicted with the oral statement he had given a few minutes earlier, when he told Investigator Clark and the solicitor, "I was driving but she was pushing me to do it. She told me to do it." Blackwood spoke again with investigators after being in jail for a few days. In that statement, he claimed, "I know I wasn't driving because I was slumped in the passenger seat." Blackwood claimed not to recall telling investigators "I've said so many statements, if I really did it and I was by myself, I don't know why I was in Cowpens." Wright played a video recording of this statement to refresh Blackwood's recollection and noted his earlier comment that he did not really remember whether Wright was with him when he struck Victim with the truck.

Johnathan Sellers saw Victim and Blackwood at Victim's home around 8:00 or 9:00 p.m. on December 26. Wright and Blackwood had walked to Sellers's house, where he lived with Victim's son, so that Wright could charge her phone. Sellers recalled Wright was upset due to "[s]omething about he cheated, sent nudes or something." Wright told Sellers she was looking for Victim and Victim did not "deserve the ground he walks on or the air he breathes." She then asked Sellers and Blackwood to ride with her to a trailer in Pacolet and on their way back, Victim called Wright.

Barzilay testified Wright came to her home in Pacolet with Blackwood around 9:00 or 9:30 p.m. on December 26. Barzilay recalled Wright was distraught, "like very upset about the pictures on [F]acebook." Wright called Victim from Barzilay's phone, and although Barzilay did not hear this conversation, she heard Wright say, "I'm going to kill the f'ing bastard." As Wright left, she told Barzilay she was going to Victim's house.

Amy Lynn Padgett, Victim's cousin, was at Barzilay's home when Wright and Blackwood arrived. She recalled Wright was angry about some pictures Victim posted on Facebook, and she heard Wright call Victim and tell him he had two minutes to remove the pictures or "I'm coming to kill you." Padgett told Wright and Blackwood to go home and lie down because she could tell they had been

drinking and they were "stumbling everywhere." She noted Wright kept saying, "I'm going to kill him, I'm going to kill him," but "[n]obody took it that way." While the group was at Barzilay's house, Padgett heard Blackwood ask Wright, "Do you want me to go do it for you?" Wright responded, "No. I can do this myself. I can handle my own."

Early the next morning, Padgett learned of Victim's death when Eric Edgins, who previously was romantically involved with Wright, came to her house and showed her a message Wright sent him stating, "Brent's dead." Padgett then called Wright, who told her "the Evans boy" beat Victim to death. Padgett observed Wright seemed nervous at the hospital that morning, and when Padgett gave Wright a ride home, they stopped at Victim's house because Wright wanted to get Victim's cell phone, which she claimed the police had authorized her to retrieve. The house was locked, and Padgett's daughter, Hannah, had to stop Wright from throwing a brick through a window to break in and find the phone. The police stopped them as they were leaving and informed them no one was allowed on the property. Later, when Padgett was assisting Wright with Victim's funeral arrangements, she heard Wright call a life insurance company to ask the identity of Victim's policy beneficiary.

Bridget Miller, Victim's sister, testified she and Wright have known each other their whole lives and were "like sisters." Miller saw Wright in a white Ford F150 at a Spartanburg gas station around 10:00 p.m. the night before Victim was killed. Miller walked over to speak to Blackwood, but he suddenly jumped in the truck and sped off, nearly hitting someone. When Wright then came over to Miller's car, she "seemed anxious" and told Miller she needed to take Blackwood home because he was drunk. Miller did not see who was driving because the two were still standing outside the truck when Miller left, however, she noted Blackwood exited the driver's seat as if to move and allow Wright to drive. Miller testified that when she knocked on Wright's door shortly after 5:00 a.m. the morning of December 27 to go to the flea market, she saw Robert Blackwell and Marie Dalton at Wright's home. That morning, Wright told Miller she was scared Victim "got beat up over a—a cell phone" he stole from a drug dealer and asked Miller to check on him.

Sherry Riley saw Victim on December 26, when he came to her house to get a pigtail extension cord for his dryer. Riley testified Victim laughed as he told her he had posted sexually explicit pictures of Wright on Facebook. Victim then showed Riley a text message from Wright telling him "if you don't take that off of [F]acebook I'm going to come to Cowpens and kill you." Riley spoke with Victim again between 10:00 and 10:40 a.m., and then again at 2:06 a.m. on December 27; she testified she could tell Victim had been drinking when they spoke at 2:06.

Around 3:00 a.m. on December 27, Marie Dalton's boyfriend, Robert Blackwell, received a call from Wright, who lived two doors down in Pacolet.  Wright asked them to come outside and talk, so the couple went to Wright's house between 3:00 and 4:00 a.m.  They then walked with Wright to the store after she offered to buy them a drink and cigarettes.  The trio returned to Wright's home shortly before Bridget Miller arrived to go with Wright to the flea market.  Dalton testified Wright seemed "off" that night and expressed concern about Victim's well-being.  Wright told Dalton Victim had "never messed up like this, that he was on drugs real bad and had done traded all the kids' Christmas but the bicycle.  Dalton noted Wright "would change it up to she was worried about he [Victim] had posted some naked pics of some girl and was worried about her boy—the woman's boyfriend hurting Brent."   Finally, Wright claimed she was worried about Victim because he had stolen a phone from a drug dealer.

Investigator Clark questioned Blackwood three times over the course of the investigation.  He recalled Blackwood's story changed substantially during a January 2017 pretrial meeting with the assistant solicitor preparing for Wright's trial.  Clark observed, "During our conversation with him he—he seemed very upset and at one point almost to tears.  His story started changing, becoming very inconsistent."  Clark denied threatening Blackwood but admitted he raised his voice to emphasize the importance of the meeting and Blackwood's trial testimony because Blackwood did not seem to be taking the meeting seriously.  Clark further admitted the only direct evidence connecting Blackwood's truck to Victim's death was Blackwood's statement because Victim's DNA was not found on the truck.

At Investigator Clark's request, computer forensics examiner Lindsey McGraw—who worked for twelve years as a computer forensics examiner for SCSO before her retirement—examined cellular devices from Victim, Blackwood, and Wright.  She testified without objection as to her efforts to use Cellebrite, the hardware law enforcement agencies use worldwide for such examinations, to extract data from the three devices.  Although Cellebrite did not support the extraction of data from Wright's older model flip phone, McGraw was able to take digital photos of Wright's cell phone display, including her inbox messages, outbox messages, and draft text messages.

Sergeant Brandon Letterman, a computer and cell phone forensics analyst, also assisted with the homicide investigation.[2]  Sergeant Letterman found Wright's identification card in the driver's side door of Blackwood's truck when he processed the vehicle.  Letterman also executed a search warrant to take photographs of the call logs on Wright's phone; the State entered these photographs into evidence without objection as State's Exhibit 3-A.  Sergeant Letterman testified the most recent call found on the phone was from December 28 at 4:26 p.m., but the phone log contained no earlier calls.  Because Wright's phone was not set to automatically delete texts or calls, she had to manually delete such earlier items.  Letterman performed a forensic examination of the phone using Cellebrite to extract Wright's contact list.  The State entered his report of the forensic examination into evidence, without objection, as State's Exhibit 3-B.

Sergeant Letterman also photographed Wright's call log, and the State entered these exhibits into evidence, without objection, as State's 3-C, D, and E.  On cross-examination, Sergeant Letterman confirmed that he prepared his report on the call logs the week before Wright's trial.  He noted Investigator McGraw executed a search warrant for an earlier extraction, but at that time—shortly after Victim's murder—the Cellebrite hardware and software did not support the extraction of data from Wright's flip phone.  The latest Cellebrite update allowed him to extract Wright's contact list.

The defense called Tom Slovenski, a licensed digital forensics examiner, as its expert in cell phone forensics and cell tower mapping.  Slovenski reviewed Wright's T-Mobile records and explained a gap in the records could indicate the phone was off or the user did not have cell coverage at that time.  He testified the cell phone tower near Wright's residence in Pacolet covered a radius of six miles, and all of her cell phone traffic between 2:07 and 3:07 a.m. on December 27, 2015, used the cell phone tower near her house in Pacolet.  He opined Wright's cell phone would have used a different tower if the phone had been in Cowpens or near the Scotchman at that time.  Slovenski acknowledged the mapping was based on the phone's pinging of cell towers, not GPS tracking, and he admitted a "gap in time could mean many things.  It could mean that the handset lost power,

---

[2] Before transferring to computer and cell phone forensics, Sergeant Letterman worked as a sergeant with the SCSO violent crimes division.  At the time of this incident, he was a senior investigator handling cold case homicide investigations. He was asked to assist with the processing of the truck in his capacity as a violent crimes investigator.

somebody turned it off, that they proceeded into an area where there was no coverage."

On cross-examination, Slovenski admitted that, depending on the network, when a phone is turned off, it will not receive text messages until the phone is powered back on. He further acknowledged the series of text messages that loaded to Wright's phone when it was switched back on at 2:09 a.m. as well as the phone's pinging of a cell tower in Pacolet at 2:18 a.m. Finally, Slovenski admitted that for the 50 minutes between 2:18 and 3:08 when there was no activity on Wright's cell phone, Wright's location was unknown. Slovenski examined only Wright's phone records; he was not given Blackwood's phone records for review and comparison.

After Wright rested her case, the State offered Sergeant Letterman as a rebuttal witness to address Slovenski's testimony about Wright's phone records and what they might establish as to her location on the night Victim died. Over Wright's objection, the circuit court qualified Sergeant Letterman as an expert in cell phone forensic examination and mapping and denied Wright's motion to exclude his rebuttal testimony. Reviewing exhibits admitted earlier in the trial, Letterman testified Wright's cell phone records indicated all incoming calls from 11:19 p.m. on December 26, 2015, to 2:04 a.m. on December 27, 2015, went straight to voicemail because the phone was either off or had died. He noted she received nine text messages, including two from Blackwood, within fourteen seconds at 2:09 a.m., suggesting Wright powered the phone back on. Letterman's review of Blackwood's cell records showed Blackwood texted Wright at 11:17 p.m. and 11:26 p.m., and his phone was not active at 2:09 a.m. The records further reflected Wright sent a text message at 2:10 a.m. and then received a text from Victim's cell phone at 2:18 a.m. After Wright received Victim's text, there was no activity on her phone until 3:08:31 a.m.

The jury found Wright guilty of murder, and the circuit court sentenced her to thirty years' imprisonment.

**Law and Analysis**

"We review evidentiary rulings for abuse of discretion, meaning we will only disturb them if they have caused prejudice and are the result of legal error or have inadequate factual support." *State v. Warner*, 430 S.C. 76, 83, 842 S.E.2d 361, 364 (Ct. App. 2020), *aff'd in part and remanded in part on other grounds*, 436 S.C. 395, 407, 872 S.E.2d 638, 644 (2022). "The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject."

*State v. Prather*, 429 S.C. 583, 598, 840 S.E.2d 551, 559 (2020) (quoting *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004)).

## I. Qualification of Expert

Wright argues the circuit court erred in qualifying Letterman as an expert in cell phone forensic examination and mapping because Letterman lacked the knowledge, training, or experience required to give such testimony.  We disagree.

"To be competent to testify as an expert, 'a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.'"  *Id.* (quoting *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997)).

When the State moved to qualify Sergeant Letterman as an expert, Wright objected, arguing his qualifications were insufficient.  Wright also objected to Sergeant Letterman's testimony as a rebuttal witness because Letterman had already testified in the State's case in chief in his capacity as a violent crimes investigator.  Wright argued, "I don't believe he's received any additional training since that point that he was called as a witness that would allow him to be deemed an expert to come in as a rebuttal witness to our expert, Your Honor.  So we would object to his qualifications as an expert and his testimony."

Addressing the qualification concern, Sergeant Letterman testified he had been a cell phone and computer forensics analyst for SCSO for seven months, and he shadowed Investigator Lindsey McGraw for a month before starting in his current position.  At the time of Wright's trial, Letterman had performed between seventy-five and eighty forensic cell phone examinations and analyzed cell phone tower information between thirty and forty times.  He used GeoTime and Cellebrite for the forensic examination of cell phones—after receiving training from the manufacturers in the use of these programs for the extraction of phone data.  Sergeant Letterman participated in a five-day training program for Cellebrite and a one-day training for GeoTime.  Although Letterman admitted he had never before testified as an expert nor published literature in the field, he had previously presented at a national homicide conference on a case involving phone mapping.

We find the circuit court did not abuse its discretion in finding Sergeant Letterman had the necessary training and expertise in the area in which the State sought to qualify him.  Sergeant Letterman shadowed another investigator before starting in

his current position, had been a cell phone and computer forensics analyst for seven months, and had prior field experience in numerous investigations. The manufacturers of GeoTime and Cellebrite trained Letterman, who then used these programs to extract cell phone data for analysis in prior investigations. *See e.g., Warner*, 430 S.C. at 88, 842 S.E.2d at 366–67 ("Church's expertise was based on his vast experience with historical cellular records, as well as his knowledge of and experience with how cellular phones, towers, and networks operate. The text of Rule 702 states expertise can be based on experience."); Rule 702, SCRE (stating that an expert may be qualified "by knowledge, skill, experience, training, or education"); *State v. Ellis*, 345 S.C. 175, 177–78, 547 S.E.2d 490, 491 (2001) (officer qualified as an expert in crime scene processing and fingerprint identification was qualified to testify to measurements taken at the scene, recovery of shell casings, and identification of blood stains, but was not qualified to testify regarding the location and position of the victim's body based on crime scene reconstruction).

Wright argues *Hamrick v. State*, 426 S.C. 638, 649, 828 S.E.2d 596, 602 (2019), supports her position, but the challenged testimony there differs from that of Sergeant Letterman. Hamrick appealed his conviction for felony driving under the influence resulting in great bodily injury after the lead investigator—who was not an accident reconstructionist—testified as to a possible point of impact. *Id.* at 645, 828 S.E.2d at 599. A critical inquiry in the case was whether Hamrick struck the road construction worker victim within the lane of travel or within the construction work area. *Id.* Our supreme court reversed Hamrick's conviction, finding the investigator's testimony about point of impact was not a lay opinion because accident reconstruction is a "highly technical and specialized field" requiring expert testimony. *Id.* at 649, 828 S.E.2d at 602.

Sergeant Letterman's testimony differs from that of the Hamrick investigator because the State did not seek to have Letterman testify regarding matters beyond his level of skill, training, education, or experience. Notably, Letterman's testimony was narrowly focused on his examination of phone records obtained from cellular providers—an area in which he had the necessary knowledge and experience. His testimony never ventured into more complex areas of forensic mapping which may indeed have required greater training and expertise than Letterman possessed. Moreover, the exhibits Sergeant Letterman discussed during his rebuttal testimony were "call detail records that were sent from the . . . cell phone company" that had already been admitted into evidence without objection earlier in the trial.

Accordingly, we find the circuit court did not abuse its discretion in qualifying Sergeant Letterman as an expert or in allowing him to testify regarding the historical records obtained from cellular providers.[3]

## II. Scope of Rebuttal Testimony

Wright next argues the circuit court erred in allowing Sergeant Letterman to testify beyond the scope of permissible rebuttal testimony. Specifically, Wright argues Letterman's testimony about Blackwood's phone was improper because Wright's expert, Slovenski, testified exclusively about Wright's phone, not Blackwood's. Wright contends Letterman's rebuttal testimony was an effort by the State to improperly supplement its case-in-chief. In light of our supreme court's decision in *Prather*, 429 S.C. at 603, 840 S.E.2d at 561, we disagree.

"The admission of reply testimony is a matter within the sound discretion of the trial judge." *Id.* at 602, 840 S.E.2d at 561 (quoting *State v. Stewart*, 283 S.C. 104, 106, 320 S.E.2d 447, 449 (1984)). "Reply testimony should be limited to rebuttal of matters raised in defense; however, the improper admission of reply testimony will only result in reversal if the admission of such testimony is found to be prejudicial." *State v. Garris*, 394 S.C. 336, 350, 714 S.E.2d 888, 896 (Ct. App. 2011). "Any arguably contradictory testimony is proper on reply." *Prather*, 429

---

[3] Wright made no argument at trial as to the reliability of Sergeant Letterman's rebuttal testimony, perhaps because such an argument would have been unsuccessful for the reasons explained in *State v. Franks*, 432 S.C. 58, 76–77, 849 S.E. 2d 580, 590 (Ct. App. 2020). First, in considering the reliability of cell site location data (CSLI) methodology, South Carolina has "join[ed] the many other jurisdictions that have deemed CSLI reliable enough to pass the Rule 702 gate." *Warner*, 430 S.C. at 89, 842 S.E.2d at 367, *aff'd in part and remanded in part on other grounds*, 436 S.C. 395, 399 n.2, 872 S.E. 2d 638, 641 n.2 (in which our supreme court noted now-Justice Hill's extensive analysis of an FBI agent's qualifications as an expert in cellular cite location data as part of the court of appeals' analysis of the admissibility the expert's opinions). Second, the historical cellular records Sergeant Letterman addressed on rebuttal had already been admitted without objection earlier in the trial. *See Franks*, 432 S.C. at 76–77, 849 S.E.2d at 590 (explaining that "[b]ecause the underlying data—the Verizon records—had already been admitted into evidence when the State offered Sergeant Kelley as an expert, Franks waived his challenge to the reliability of the data by failing to object at the time the State introduced the data").

S.C. at 603, 840 S.E.2d at 561 (quoting *State v. South*, 285 S.C. 529, 535, 331 S.E.2d 775, 779 (1985)).

Wright offered Slovenski as her expert in cell phone forensics and cell tower mapping. Slovenski testified Wright's cell phone used the tower near her house in Pacolet for all activity from 2:07 a.m. to 3:07 a.m., and explained her phone would have used a different tower had it been in Cowpens where Victim was killed. He further opined Wright's cell phone was not in Cowpens between 11:00 p.m. and 5:00 a.m., although he admitted any gaps in Wright's cell records could indicate her phone was turned off or dead. The State's rebuttal expert, Sergeant Letterman, testified Wright's call records indicated all incoming calls from 11:19 p.m. on December 26, 2015, to 2:04 a.m. on December 27 went straight to voicemail, which likely indicated the phone was either switched off or had died. He noted she received nine text messages, including two from Blackwood, within fourteen seconds around 2:09 a.m., suggesting the series of texts loaded when she turned the phone back on at 2:09 a.m. Letterman testified Blackwood's cell records reflected he sent text messages to Wright at 11:17 p.m. and 11:26 p.m., and Blackwood's phone was not active at 2:09 a.m. The records further showed Wright sent a text message at 2:10 a.m. and received a text from Victim's phone at 2:18 a.m. After Wright received Victim's text, there was no activity on her phone until 3:08 a.m.

We find the circuit court did not err in allowing Sergeant Letterman's rebuttal testimony because the State offered it in response to Slovenski's opinion regarding the location of Wright's phone. Letterman's testimony addressing Blackwood and Wright's phone records served to rebut Slovenski's opinion that Wright's cell phone was not in Cowpens from 11:00 p.m. to 5:00 a.m. Even though Slovenski admitted there were hours for which the records did not show the location of Wright's phone, his opinion suggested to the jury that she could not have been in Cowpens at the time of Victim's fatal encounter. Thus, Sergeant Letterman's testimony about Wright's phone being off or dead during key periods of the evening was unnecessary until Slovenski testified her phone was in Pacolet—not twelve miles away in Cowpens—between 11:00 p.m. and 5:00 a.m. *See Prather*, 429 S.C. at 604, 840 S.E.2d at 562 ("The reply testimony was made necessary by the evidence which the appellant had submitted. The reply testimony did not go beyond a refutation of that which the appellant's witness had asserted. It can hardly be argued that the appellant's counsel was taken by surprise." (quoting *State v. Durden*, 264 S.C. 86, 90, 212 S.E.2d 587, 589 (1975)). Sergeant Letterman only testified about the portion of Blackwood's call records in relation to the messages between Blackwood and Wright and to the last outgoing text from Blackwood at 11:26 p.m. Since this text—along with eight others—did not load to Wright's

phone until 2:09 a.m., Sergeant Letterman's testimony addressing the phone records supported the State's theory that Wright's phone was powered down at key times throughout the night. This properly rebutted Slovenski's testimony suggesting Wright's phone was in Pacolet all night and could not have been in Cowpens when Victim was killed.

**Conclusion**

Based on the foregoing, Wright's conviction is

**AFFIRMED.**

**THOMAS, J., and HUFF, A.J., concur.**